HANS J. LILJEBERG, Judge.
12Defendant appeals his convictions and sentences for violations of La. R.S. §§ 14:27:30.1 and 14:30.1. We affirm.

Procedural History

On June 14, 2012, a Jefferson Parish Grand Jury returned an indictment charging defendant, Charles Coleman, with attempted second degree murder in violation of La. R.S. 14:27:30.1 (count one), second degree murder in violation of La. R.S. 14:30.1 (count two), and possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1 (count three). On June 15, 2012, defendant pleaded not guilty to all charges.
On June 10, 2013, the trial court heard and denied defendant’s motion to sever counts, motion to quash based on prescription, motion to quash the indictment as constitutionally deficient, motion to declare Art. 782(A) unconstitutional, motion for continuance, and objection to State’s Pri-eur notice. |sThe court granted defendant’s motion to declare La. R.S. 14:95.1 unconstitutional and granted a defense motion in limine.
On June 11, 2013, defendant proceeded to trial on the remaining charges of attempted second degree murder and second degree murder; and on June 12, 2013, a 12-person jury found defendant guilty as charged on both counts.
On August 9, 2013, the trial court sentenced defendant, on count one, to ten years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On count two, the court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
That same day, defendant filed a motion to reconsider sentence and a motion for appeal. On August 12, 2013, the trial court denied the motion to reconsider sentence and granted defendant’s motion for appeal.

Facts

Kevin Adams, a victim in this case, was acquainted with defendant from “the neighborhood” and in May 2007, frequently sold him drugs. One such instance occurred on May 7, 2007, when Mr. Adams *133 met defendant three times to sell him crack cocaine. At their third meeting, at approximately 11:00 a.m., Mr. Adams met defendant in an abandoned house on Mather Drive in the Lincolnshire subdivision in Marrero, across the street from defendant’s house. During this transaction, defendant brandished a gun and pointed it at Mr. Adams. Mr. Adams threw his cell phone at defendant, striking him in the face. Defendant managed to discharge his weapon five times, striking Mr. Adams once in the collar bone and four times in his right side. The two men then fled the house. Mr. Adams sought help from neighbors who called the police.
LDetective Kevin Tillman of the Jefferson Parish Sheriffs Office was dispatched to the scene. As he neared the location, he observed Mr. Adams covered in blood. He quickly exited his vehicle to render assistance and called for EMS. Mr. Adams told the detective: “Bird shot me.”[1] EMS arrived shortly thereafter and transported Mr. Adams to the hospital where he underwent surgery.[2]
Around noon, Lieutenant Kevin Decker and Detective Willie Jones of the Jefferson Parish Sheriffs Office responded to the scene where Detective Tillman encountered Mr. Adams. From this location, the officers followed a trail of blood into a nearby abandoned residence. Inside, they recovered two cartridge casings and a cell phone.
Later that same day, Ayesha Carter, a self-proclaimed rehabilitated drug addict, left work early and headed home. On her way home, she stopped in the Woodmere subdivision in Harvey to see Marlon Turner, a childhood friend, drug dealer, and the second victim in this case. Ms. Carter planned to smoke marijuana with him. When she arrived, Mr. Turner sat in the passenger seat of her vehicle and they smoked. While sitting there, Mr. Turner received several phone calls, to which he responded: “I’m coming. I need a moment. I’m getting my car washed. Give me a minute, I’ll be there.” Mr. Turner then asked Ms. Carter if she could give him a ride to meet a “dude.” She agreed, and as they made their way, Mr. Turner received several more phone calls, to one of which he responded: “I’m on my way.” To another, he stated: “I’m not in my car. I’m in a little black box.”[3] However, when they arrived at the location, there was no one there. Mr. Turner was then directed to another location. As they proceeded to that location, Ms. | ^Carter asked if Mr. Turner knew this person, to which he responded, “Yes. That’s nobody but Bird.” When they arrived at the second location, Ms. Carter stopped the vehicle as defendant approached. He entered the vehicle and sat in the rear passenger seat.
Ms. Carter, preferring not to have a drug deal take place in her vehicle, told Mr. Turner to hurry up and do what he needed to do. Defendant offered to move to his vehicle, but Mr. Turner replied that they were okay where they were. Waiting for the two men to finish the transaction, Ms. Carter turned around to see defendant patting himself down, looking for what she assumed was money.
Mr. Turner then retrieved from his pocket what appeared to be a bag of crack cocaine and asked Ms. Carter for a ciga *134 rette. Within moments, Ms. Carter heard a “pop” and her vehicle “lit up with fire,” prompting her to jump out, screaming, “Lord, please don’t kill me.” As she fled, she heard another shot a few seconds later. She made it to a nearby friend’s house, where she called the police. Mr. Turner died at the scene.
Around 2:45 p.m., Sergeant Eddie Klein of the Jefferson Parish Sheriffs Office responded to the scene in Woodmere near the intersection of Inwood Drive and Des-trehan Avenue, near Mather Drive, the street of the abandoned residence where Mr. Adams was shot earlier. Two .380 caliber casings and a cell phone were recovered on the scene. The cell phone and one of the casings were located in the rear seat of the vehicle. The other casing was located in the street next to the vehicle.
The police determined that the cell phone belonged to defendant. This phone was compared with the cell phone recovered from the abandoned residence on Mather Drive. A review of the phones’ call logs revealed that this phone received a call from defendant’s phone.
| nLater that day, Ms. Carter identified defendant from a photographic lineup as the man who shot Marlon Turner. At trial, she acknowledged that she did not see the discharge of a gun, but avowed she is “absolutely certain” that defendant shot and killed Turner.
Warrants for defendant’s arrest were subsequently issued relating to the shootings of Kevin Adams and Marlon Turner. Pursuant to a tip, Detective Michael Hamilton and several other officers of the New Orleans Police Department located defendant in a New Orleans residence in possession of a loaded .40 caliber handgun. He was placed under arrest and read his Miranda[4] rights, which he indicated he understood, and was then transported to the detective bureau.
There, Sergeant Jeffrey Rodrigue and Detective Jason Barrett of the Jefferson Parish Sheriffs Office interviewed defendant. With a rights of arrestee form, defendant was again advised of his rights, indicated he understood them, waived them, and “provided two recorded statements.
In defendant’s first statement, he admitted that he shot “Black”[5] after “tussling over the gun.” He explained that he knew the victim from around the neighborhood and that he bought drugs from him. On the morning of the murder, defendant encountered the victim at a barber shop and confronted him about an unpaid debt. Defendant agreed to call the victim later; and after several calls back and forth, the two men agreed to meet in Woodmere. When they met, defendant approached the victim, who was seated in the passenger seat of a vehicle, with an unknown female in the driver’s seat. The victim had drugs and money sitting on his lap. Defendant, who claimed he was unarmed, also noticed a gun tucked beside the victim in the center console.
17According to defendant, the victim told defendant to get in the car and told the driver to get out, which she did. Defendant sat in the rear seat behind the driver, at which point the victim asked defendant for his phone. After defendant handed over his phone, the victim started “cussing and talking crazy.” Defendant then said something that angered the victim and the two men started arguing. During this argument, the victim reached for his gun, prompting defendant to grab and twist the victim’s hand, wrestling the gun away from *135 him and causing it to discharge twice. Defendant then grabbed the money and drugs off the victim’s lap and fled. He made his way to a hotel in New Orleans, where he snuck into a room and left the gun there. He specified that the gun was a .380 caliber.
In defendant’s second statement, he explained that prior to his fight with Mr. Turner, he met “Black Head”[6] in an abandoned house across the street from his mother’s house. Defendant was rolling a crack cigarette when “Black Head” snatched the drugs and fled the house. This prompted defendant to discharge his .380 caliber handgun. Defendant acknowledged that this was the same gun he used to shoot Marlon Turner later that day. Consequently, he admitted that the portion of his first statement was incorrect wherein he stated he acquired the gun at the time he shot Turner. He explained that he acquired the gun from Turner two days prior and was returning the gun to him at the time he was killed.
The police determined that the gun found in defendant’s possession at the time of his arrest was not the weapon used in either of the two shootings. Jene Rauch, an expert in firearms identification with the Jefferson Parish Sheriffs Office Crime Lab, did determine, however, that the projectiles and fragments recovered during the autopsy of Marlon Turner were fired from the same gun. Ms. Rauch additionally established that the four casings recovered from both scenes |8were also fired from the same gun. Based upon the size, weight, and rifling, the class was determined to be consistent with a .380 caliber automatic. The actual weapon used in the shootings was not recovered.

Assignment of Error No. 1

The trial court deprived defendant of his fundamental constitutional right of eon-frontation by permitting the State to repeatedly interrupt defendant’s attempts at cross-examination of a critical prosecution witness. The error was not harmless and warrants reversal.

Discussion

In defendant’s first assignment of error, he argues that his constitutional right of confrontation was violated when defense counsel was prevented from conducting an effective cross-examination of Kevin Adams.
As the only witness to the crime against him, the defense recognized the importance of Mr. Adams’ testimony. Accordingly, the defense sought to cross-examine Mr. Adams, a multiple felony offender, regarding any leverage the State might have over him with respect to his probation status. However, because the State repeatedly interrupted this cross-examination with objections sustained by the trial court, defendant claims that he was unable to fully explore any motivations affecting Adams’ testimony. This, he contends, violated his constitutional right of confrontation.
In response, the State maintains that the trial court exercised reasonable control over the scope of cross-examination and that defendant was afforded a full opportunity for effective cross-examination. The State alternatively submits that even if the trial court erred in limiting defense counsel’s cross-examination of the witness, any such error was harmless in light of other incriminating evidence adduced at trial.
|9The right to confront witnesses is ensured in both the federal and state constitutions. State v. Draughn, 05-1825 (La.1/17/07), 950 So.2d 583, 615, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). The Sixth Amend *136 ment to the United States Constitution guarantees the right of an accused in a criminal prosecution “to be confronted with the witnesses against him.” Article 1, Section 16 of the Louisiana State Constitution guarantees the accused the right “to confront and cross-examine the witnesses against him.”
The Louisiana Supreme Court has held that the right of confrontation is more than physically confronting witnesses, where its main and essential purpose is to secure for the opponent the opportunity of cross-examination, which has been termed “the principal means by which believability and truthfulness of testimony are tested.” Draughn, 950 So.2d at 615-16. Yet, the right of confrontation guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish. State v. Pierre, 13-0873 (La.10/15/13), 125 So.3d 403, 411.
The Louisiana Code of Evidence permits a witness to be cross-examined on any matter relevant to any issue in the case, including credibility. See La. C.E. art. 611(B). Indeed, this Court recognizes that impeaching a witness for bias or interest and exposing a witness’ motivation in testifying are proper functions of cross-examination. See State v. Micelotti 07-808 (La.App. 5 Cir. 4/15/08), 984 So.2d 847, 854, writ denied, 08-0950 (La.12/12/08), 997 So.2d 559.
In addition, the trial court is empowered to exercise reasonable control over the manner of cross-examination so as to: (1) ensure the effectiveness of the interrogation as a mode of ascertaining the truth; (2) avoid needless consumption of time; and (3) protect witnesses from harassment or undue embarrassment. Draughn, 950 So.2d at 616 (citing La. C.E. art. 611(A)). This includes the court’s | ^discretion to preclude repetitive interrogation. See Draughn, 950 So.2d at 616. Furthermore, a trial court’s rulings as to the scope and extent of cross-examination should not be disturbed on appeal absent an abuse of the court’s broad discretion. State v. Ventris, 10-889 (La.App. 5 Cir. 11/15/11), 79 So.3d 1108,1125.
In the instant case, defendant argues that his right to confront and cross-examine Mr. Adams was violated when the trial court sustained the State’s objections on the ground that defense counsel’s questioning was argumentative.
 “An argumentative question ... is improper because it does not seek to elicit relevant, competent testimony, or often any testimony at all.” People v. Chatman, 38 Cal.4th 344, 42 Cal.Rptr.3d 621, 133 P.3d 534, 563 (2006), cert. denied, 549 U.S. 1120, 127 S.Ct. 938, 166 L.Ed.2d 718 (2007). It “is a speech to the jury masquerading as a question. The questioner is not seeking to elicit relevant testimony. Often it is apparent that the questioner does not even expect an answer. The question may, indeed, be unanswerable.” Id. Put differently, an argumentative question “essentially talks past the witness, and makes an argument to the jury[.]” Id.
In his brief to this Court, defendant complains of several instances during the cross-examination of Kevin Adams in which the trial court sustained the State’s objections on grounds of argumentativeness. We address each in turn.
The first instance occurred as follows:
[DEFENSE]: Now, in response to the district attorney’s question about whether anything was offered to you by the detectives when you met with them in 2012, she specifically asked about your probation. Were you hav *137 ing issues with your probation back then?
[ADAMS]: No.
[DEFENSE]: No? Okay. So she just kind of asked that for no reason?
lu[STATE]: Objection, your Honor. Argumentative. It’s asked and answered. And it’s speculation on why I asked a question.
[COURT]: Rephrase the question.
Here, the trial court did not err in disallowing defense counsel’s question— “So she just kind of asked that for no reason?” — as argumentative. For one, it seems this question did not seek to elicit relevant evidence. “Relevant evidence” is evidence having any tendency to make the existence of any element of the charged offense more probable or less probable. See La. C.E. art. 401. The prosecutor’s reasons for asking about Mr. Adams’ probation had no tendency to make the existence of any element of the attempted murder of Mr. Adams more probable or less probable. And two, the question appears to have been unanswerable by Mr. Adams. There is no indication that Mr. Adams knew or could have known the prosecutor’s reasons for her questions. It is apparent that defense counsel’s question was posed rhetorically, such that its intended effect — impeaching the witness by emphasizing to the jury the illogic of his response — did not depend on an answer from the witness. Counsel seems to have been circumventing the witness and speaking to the jury under the guise of a question. For these reasons, the trial court did not abuse its discretion in disallowing this question as argumentative.
Turning to the second instance, defense counsel continued to question Mr. Adams regarding whether he was “having, trouble” with his probation. When Mr. Adams answered that he was not in trouble, counsel pressed him: “You’re not in trouble?” The following then occurred:
[ADAMS]: No. I’m in jail.
[DEFENSE]: You’re in jail. So but that’s not trouble?
[ADAMS]: Yeah, that’s—
INSTATE]: Objection, your Honor. Now, that’s becoming argumentative.
[COURT]: Let’s move on.
[DEFENSE]: It’s cross-examination, Judge. And the gentleman—
[STATE]: It doesn’t mean you get to argue with him.
[DEFENSE]: Excuse me. The gentleman has testified he’s not in trouble.
[STATE]: That’s his answer. Accept it.
[COURT]: That’s his opinion.
[DEFENSE]: Okay.
[DEFENSE]: So, Mr. Adams, do you consider being in jail, facing a long stretch of jail, not to be in trouble?
[ADAMS]: Jail don’t have—
[STATE]: Objection, Judge.
[ADAMS]: — nothing to do with this case.
[STATE]: He’s still becoming argumentative.
[DEFENSE]: It’s cross-examination, Judge.
[ADAMS]: It still don’t have nothing to do with this case.
[DEFENSE]: So you consider having charges, facing a long stretch of jail, not to be in trouble?
[ADAMS]: It still don’t have—
[STATE]: Objection, Judge. Argumentative.
[ADAMS]: — nothing to do with this case.
After a bench conference, the court permitted the questioning to continue:
[DEFENSE]: ... Is it your testimony you don’t consider yourself to be in trouble right now?
[ADAMS]: No.
*138 J¿DEFENSE]: You don’t?
[ADAMS]: No.
The foregoing indicates that the trial court did not prevent defense counsel from questioning the witness on this point. Rather,, it is evident that the witness provided an answer after repeated questioning. Therefore, contrary to defendant’s claim, defendant’s right to confrontation was not violated where defense counsel was permitted to ask the question and received a response.
In the third instance, after questioning Mr. Adams about the possibility of his receiving a deal in connection with the charges pending against him, defense counsel stated: ‘You know the system. You’ve been in the system. You’ve gotten probation. You’ve had trouble with your probation. You’re familiar with the system, right?” Mr. Adams replied: “True.”
The State then objected:
[STATE]: Your Honor, I never said that he had problems with his probation. He’s already answered what he thinks is the status. And the objection that lies, that was made at the bench, is he shouldn’t be asking these questions to elicit circumstances—
[[Image here]]
[COURT]: All right. He’s under cross-examination, but you’ve already covered it. You’re probably not going to get another answer out of this gentleman other than what he’s given you about whether he’s in trouble or not. So just move on.
[DEFENSE]: Please note my objection.
[COURT]: All right.
The record reflects that Mr. Adams repeatedly denied having trouble with his probation. Despite this testimony, defense counsel asserted the contrary: ‘You’ve had trouble with your probation.” This effort by defense counsel to elicit testimony from Mr. Adams that he had been or was in trouble with his probation is 114notable since counsel did not frame it as a question but as a statement. By so doing, counsel impermissibly assumed facts not in evidence. See United States v. Smith, 354 F.3d 390, 396 n. 5 (5th Cir.2003), cert. denied, 541 U.S. 953, 124 S.Ct. 1698, 158 L.Ed.2d 386 (2004) (“A common vice is for the examiner to couch [a] question so that it assumes as true matters to which the witness has not testified, and which are disputed between the parties ... [W]hether the witness is friendly or hostile, the answer can be misleading. If the witness answers the question without separating out the assumption, it is impossible to determine whether the assumption was ignored or affirmed.”) (quoting McCormick on Evidence § 7 (5th ed.1999)).
Moreover, Mr. Adams was repeatedly asked, and he repeatedly answered that he was not in trouble with his probation. Therefore, we find that the trial court did not abuse its discretion in disallowing this repetitive questioning. See State v. Durham, 94-1036 (La.App. 5 Cir. 4/16/96), 673 So.2d 1103, 1119 (“The trial court is afforded wide discretion in limiting repetitive ... questioning on cross-examination.”).
In the fourth and final instance, after defense counsel continued to receive disagreeable answers from Mr. Adams, he posed the question: ‘You like to control things, don’t you Mr. Adams?” The following then occurred:
[ADAMS]: No.
[STATE]: Objection, your Honor. Argumentative-. Mr. Adams has the same presumption of innocence—
[DEFENSE]: He’s not on trial, Judge. Mr. Adams is not on trial in this case.
[STATE]: Objection, your Honor.
*139 [COURT]: Don’t get argumentative. Just ask him your questions.
^[DEFENSE]: You like to be in control of things, don’t you, Mr. Adams?
[STATE]: Objection, your Honor. The same objection that I just lodged, and then you gave a response, and he repeated the same question.
[DEFENSE]: It’s not argumentative.
[COURT]: It’s argumentative. Move on.
[DEFENSE]: Mr. Adams, why are you so evasive with your answers on cross-examination?
[ADAMS]: Evasive—
[STATE]: Objection, your Honor. That’s not ... a relevant question leading towards the facts and circumstances of the instant case.
[DEFENSE]: It goes toward the testimony and credibility of the witness, Judge.
[COURT]: You framed it in an argumentative way, Mr. Fleming. Just ask him your questions.
Neither question (“You like to control things, don’t you Mr. Adams?” and “Why are you so evasive with your answers on cross-examination?”) sought to elicit testimony relevant to the issues at trial. Instead, by these questions, independent of Mr. Adams’ answers, it is apparent defense counsel sought to convey to the jury his belief that Mr. Adams was controlling and evasive. As such, the trial court did not abuse its discretion in disallowing these argumentative questions.
Further, an error with respect to a defendant’s right to confrontation is subject to a harmless error analysis. Micelotti, 984 So.2d at 854. If a confrontation error is found to have occurred, a reviewing court must determine whether the error is harmless beyond a reasonable doubt. Id. The factors considered when determining whether the guilty verdict rendered was unattributable to the error include the importance of the witness’ testimony, whether the testimony , was | ^cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination that was otherwise permitted, and, the overall strength of the State’s ease. Micelotti 984 So.2d at 854. Appellate courts should not reverse convictions for errors unless the accused’s substantial rights have been violated. Id.
In the present case, because Mr. Adams was the only witness to the crime against him, his testimony was indispensable to the State’s case. Yet, despite the State’s objections, the record indicates that the jury was made aware of Mr. Adams’ prior felony convictions and that charges were pending against him at the time of defendant’s trial. Consequently, the jury was cognizant of the circumstances under which Mr. Adams offered his testimony. For this reason, any errors the trial court may have committed in sustaining the State’s objections were harmless.
This assignment of error lacks merit.

Assignment of Error No. 2

It was error to deny the motion to quash challenging the so-called “short form” indictment.

Discussion

In defendant’s second assignment of error, he argues that the trial court erred in denying his motion to quash the indictment on the basis that the second degree murder charge was constitutionally deficient. In that motion, defendant argued that the charge, which utilized the short form indictment, was deficient because it failed to specify whether the grand jury indicted defendant on the specific intent *140 theory or the felony murder theory of second degree murder. The trial court denied this motion.
|17In response, the State maintains that the trial court did not abuse its discretion in denying the motion since defendant was properly charged with a short form indictment.
Article I, Section 13 of the Louisiana Constitution requires that an indictment inform a defendant of the nature and cause of the accusation against him. State v. Chairs, 12-363 (La.App. 5 Cir. 12/27/12), 106 So.3d 1232, 1240, writ denied, 13-0306 (La.6/21/13), 118 So.3d 413. This requirement is implemented by La. C.Cr.P. art. 464, which provides:
The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.
La.C.Cr.P. art. 465 authorizes the use of specific short form indictments in charging certain offenses, including second degree murder.[7] Chairs, 106 So.3d at 1240. Both this Court and the Louisiana Supreme Court have consistently upheld the constitutionality of these short forms. Id. (citing Draughn, 950 So.2d at 624).
For instance, in Chairs, supra, the defendant, who was convicted of second degree murder, argued on appeal that the trial court erred in denying his motion to quash the indictment. He argued in the motion that the short form was constitutionally deficient due to its failure to specify whether his prosecution was being pursued under the specific intent theory or the felony murder theory of second degree murder. Chairs, 106 So.3d at 1240. His indictment read in pertinent part: “... on or about the 8th day of November, 2009, the said ROGER 11SD. CHAIRS ... violated R.S. 14:30.1 in that [he] did commit second degree murder of a known juvenile (DOB 4/29/2002).” Chairs, 106 So.3d at 1241.
This Court determined that the defendant was fully aware of the nature of the charges against him and concluded that the trial court did not abuse its discretion in denying the defendant’s motion to quash. Id. In reaching this conclusion, this Court noted that the indictment conformed to the short form provided in La. C.Cr.P. art. 465(A)(32) and that the defendant was provided with ample discovery, including police reports, arrest warrants, search warrants, crime lab reports, and statements of witnesses and co-defendants. Id.
Likewise, in the instant case, the indictment complied with the short form in La. C.Cr.P. art. 465(A)(32), as it provided: “... on May 7, 2007, the said CHARLES COLEMAN A/K/A ‘BIRD’ violated La. R.S. 14:30.1 in that he did commit the second degree murder of Marlon Turner.”
While the record reflects that defendant requested and was provided with discovery, the contents of that discovery are not evident from the record. Nevertheless, where defendant does not complain of discovery violations and the indictment complies with the short form, defendant was adequately informed of the nature of the charges against him. Therefore, we find no abuse of discretion in the trial court’s *141 denial of defendant’s motion to quash the indictment. See State v. Love, 00-3347 (La.5/23/03), 847 So.2d 1198, 1206 (“An appellate court is allowed to reverse a trial court judgment on a motion to quash only if that finding represents an abuse of the trial court’s discretion.”).
This assignment of error is additionally without merit.

Error Patent Discussion

This Court routinely reviews the record for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, |1S556 So.2d 175 (La.App. 5 Cir.1990). A review of the record reveals the following errors patent.
First, errors appear in the “State of Louisiana Uniform Commitment Order.” The Uniform Commitment Order incorrectly states that the sentence and adjudication date was August 9, 2013, and that the offense date was February 24, 2012. The record indicates that the jury returned its verdicts on June 12, 2013. The indictment and evidence adduced at trial indicate that the offenses occurred on May 7, 2007.
In order to ensure an accurate récord, we remand this matter and order the Uniform Commitment Order be corrected to reflect the correct adjudication and offense dates. See State v. Long, 12-184 (La.App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142. Further, the clerk of the district court is ordered to transmit the original of the corrected Uniform Commitment Order to the officer in charge of the institution to which defendant is sentenced and to the Department of Corrections’ legal department. Id. (citing La.C.Cr.P. art. 892(B)(2); State ex rel. Roland v. State, 06-0244 (La.9/15/06), 937 So.2d 846 (per curiam)).
Second, a review of the transcript reveals that the trial court failed to inform defendant of the prescriptive period for seeking post conviction relief as required by La.C.Cr.P. art. 930.8(C). This Court typically corrects this error patent by way of its opinion. See State v. Austin, 12-629 (La.App. 5 Cir. 3/13/13), 113 So.3d 306, 318, writ denied, 13-0673 (La.10/25/13), 124 So.3d 1092; State v. Cammatte, 12-55 (La.App. 5 Cir. 9/11/12), 101 So.3d 978, 986, writ denied, 12-1370 (La.10/26/12), 99 So.3d 644, and writ denied, 12-2247 (La.4/5/13), 110 So.3d 1075. Accordingly, by this opinion, we advise defendant that no application for post conviction relief, including applications which seek an out-of-time appeal, shall be | ^considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.

Decree

Considering the foregoing, defendant’s convictions and sentences are affirmed.

AFFIRMED & REMANDED FOR CORRECTION OF COMMITMENT.

. "Bird” is defendant's nickname.

. After his hospital visit, Mr. Adams disappeared. It wasn’t until five years after the shooting, in 2012, that the authorities located Mr. Adams. On June 6, 2012, Mr. Adams was shown a lineup, from which he identified defendant as his assailant. Mr. Adams also identified defendant as his assailant in open court.

.Ms. Carter’s vehicle is black.

, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. "Black” is the name by which defendant knew Marlon Turner.

. Defendant claimed he did not know "Black Head's” name.

. The short form for second degree murder is provided in La. C.Cr.P. art. 465(A)(32), which provides: "A.B. committed second degree murder of C.D.”