GARRETT, J.
JjThe defendant, Tommy Lee Wilson, was found guilty . as charged of three counts of first .degree murder by unanimous votes „ of the jury. Although the defendant had been indicted for first degree murder, the state did not seek the death penalty. The trial court imposed *617 the mandatory life sentence without benefit of parole, probation or suspension of sentence for each count and directed-that the sentences be served consecutively. The defendant appeals, urging four assignments of error. We affirm the defendant’s convictions and sentences.
FACTS
The victims in this case were Irene Ellison, age 78; her 41-year-old daughter, Carisa Ellison; and Carisa’s boyfriend, Brian Wilson, age 58.[1] The women lived in a three-bedroom house in the 4000 block of Gloria Drive in Shreveport with Kenneth Ellison, Irene’s son and Carisa’s brother. At the time of the murders, Brian was living in a shed located behind the house.
On the night of July 18, 2013, a 911 operator received a phone call from a hysterical Kenneth at about 9:30 p.m.[2] He reported that he had just found his mother tied to a chair in her bedroom and that she had been shot. His call was transferred to the police department. While talking to an officer and walking through the darkened living room to turn on the porch lights for the emergency personnel responding to his call, Kenneth tripped I gQver Brian’s feet.[3] Brian’s body was lying partially on the couch. Kenneth told the officer that Brian had been dating his sister. Like Irene, Brian also had a bloody wound to the chest. Kenneth then found his sister lying face down on her bed in a pool of blood.
All three victims had been stabbed to death. The forensic pathologists who performed their autopsies opined that the victims’ wounds were consistent with a single-edged blade, like a kitchen or steak knife. Brian had a single stab wound to the upper left chest. He also had an abrasion to his left cheek and two sharp force,- incised wounds to fingers ón his right hand, possible signs of a struggle with his killer. Irene, whose hands were bound behind her with an electrical, extension cord, had also been stabbed in the upper left chest. After the initial penetration into her heart, the knife had been withdrawn slightly and turned; thus, there were actually two wounds to the heart wall. Additionally, Irene had a,superficial, incised wound to her scalp above the right ear.
Carisa had been stabbed 13 times. Most of her wounds' were to her neck, upper chest and upper back. The forensic pathologist who ' examined Carisa’s body noted that he had seen similar injuries before, usually in domestic violence cases involving feelings of love and* hate toward the victim. He especially noted that a great deal of force was used to make the deep stab wounds to Carisa’s chest, which caused her lung to collapse and prevented her from breathing. - A broken tooth and disarrayed clothing indicated that a fierce struggle occurred between Carisa and her killer. Her |sshirt was ripped, and her pants were unfastened and" unzipped and partially off her wais.t. A blanket had been draped,-.over her; there were no sheets on the bed.
Upon entering the residence, police officers immediately noticed a strong bleach smell. " They also observed apparent bleach stains on the carpet. One of the *618 officers securing the outside perimeter of the crime scene discovered a bottle of bleach in an. outside trash can. Bubbles in the bottle indicated that it had been recently shaken or dropped. Testimony adduced at trial showed that bleach degrades DNA evidence.
The crime scene was meticulously processed by crime scene investigators, who photographed, collected, and catalogued all evidence deemed relevant to the murders. There was no sign of forced entry into the Ellison residence, which was described as well maintained and nicely decorated.- In fact, one crime scene investigator -'described the house as one of the most immaculate crime scenes he had ever seen. Due to the very clean and orderly condition of the home, it was quickly observed that one of the knives in a butcher block in the kitchen had not been properly placed in the block. Examination of this knife revealed that there was a difference in how it had been washed as compared to the other knives in the block.
Some blood drops were found in the bathroom. A plastic produce bag stained with fresh blood was discovered, in the kitchen trash can. The blood was determined to be Carisa’s. A partial palm print found in the blood was subsequently matched to the defendant.
|4The police verified Kenneth’s alibi, thus eliminating him as a suspect. Due to the particular brutality of Carisa’s murder, the police concluded that she was the killer’s main target, and they began focusing on who would want to harm her. A neighbor who was interviewed by the police stated that, while Carisa had several male friends who visited her, the defendant stood out the 'most. The neighbor recounted that he. had often seen the defendant hiding in the cemetery across the street and in the bushes outside the Ellison residence, watching the house. Likewise, Kenneth had unexpectedly encountered the defendant outside the house only two weeks before the murders.
The defendant was interviewed by the police on July 22, 2013, at which time he gave a recorded statement wherein he claimed that he had been at the hospital with his ill brother at the time of the murders. However, his brother told the police that the defendant was gone from the hospital between 5 p.m. and 9:30 p.m. After the bloody palm print on the plastic bag was matched to the defendant, the police obtained arrest warrants for him.
The defendant was arrested on July 26, 2013, on three counts of second degree murder. Photos taken of his right wrist and forearms showed semicircle injuries, similar to fingernail marks. Forensic analysis matched DNA found under Brian’s fingernails to the defendant. During a recorded statement given after he was advised of his Miranda rights, the defendant made numerous remarks which contradicted those in his first recorded statement. Notably, in the first interview, he initially said he had not been in the Ellison house in two months, but then changed the time period to one |Bmonth. He indicated that, at that time, he had sex with Carisa at the house. During the second interview, he stated that he had been there in the last two weeks, then changed it to perhaps the week before, and he asserted that he had had sex with Carisa in her bed.
On the day of the defendant’s arrest, the police were contacted by Gwendolyn Davis, who worked for the Shreveport Housing Authority. She managed the apartment complex where the defendant’s brother resided. She was also a friend of Carisa. She recounted a conversation she had with the defendant just four days after the murders, in which he told her several details pertaining to the crime scene. None of these details had been released by the *619 police to the public at the time of their conversation. Among these were the location and condition of the bodies, including the facts that Irene was tied up and that all the victims were stabbed in the chest. The defendant also claimed that he and Carisa were “special, special friends,” and he became upset when Ms. Davis referred to Brian as Carisa’s boyfriend.' He further told Ms. Davis that Irene had banned him from her house because she thought he had cut a cord supplying electricity from the house to the shed; he denied cutting the cord.[4] The defendant asserted to her that Kenneth was the killer.
The defendant was subsequently indicted on three counts of first degree murder. Trial was held in July 2015. The defendant testified in his own defense, denying that he harmed or killed the victims. The jury | ^unanimously convicted him as charged on all counts. The trial court imposed the mandatory sentence of life imprisonment without benefit of parole, probation or suspension of sentence on each count, ordering that they be served consecutively. The defendant appealed.
SUFFICIENCY OF EVIDENCE
In two of his assignments of error, the defendant contends that there was insufficient evidence to support his three convictions for first degree murder and that the trial court erred in denying his motion for post-verdict judgment of acquittal.

Law

When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine' the sufficiency of the evidence. The reason for reviewing the sufficiency of the evidence first is because the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proven beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Cortez, 48,319 (La.App.2d Cir.8/7/13), 122 So.3d 588.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the. essential elements of the crime proven beyond a reasonable doubt.” Jackson v. Virginia, supra; State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 2008-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 2009-0310 (La.11/6/09), 21 So.3d 297.
Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Broome, 49,004 (La.App.2d Cir.4/9/14), 136 So.3d 979, writ denied, 2014-0990 (La.1/16/15), 157 *620 So.3d 1127. For a case resting essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; State v. Gipson, 45,121 (La.App.2d Cir.4/14/10), 34 So.3d 1090, writ denied, 2010-1019 (La.11/24/10), 50 So.3d 827; State v. Broome, supra.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct | ^evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, supra; State v. Hill, 47,568 (La.App.2d Cir.9/26/12), 106 So.3d 617.
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). As a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances of the offense and the defendant’s actions. State v. Thornton, 47,598 (La.App.2d Cir.3/13/13), 111 So.3d 1130. Specific intent to kill or inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries. State v. Murray, 49,418 (La.App.2d Cir.1/14/15), 161 So.3d 918.
La. R.S. 14:30 provides, in relevant part:
A. First degree murder is the killing of a human being: . .
[[Image here]]
(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.
(5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve or' sixty-five years of age or older.

Discussion

The defendant contends that the evidence presented at trial was insufficient to support his conviction for the murders and provided “no direct evidence of defendant’s presence at the crime scene.” In so arguing, the defendant ignores or misrepresents the evidence presented at trial.
In reaching its verdict, the jury had the benefit of all the extensively documented evidence painstakingly recovered from the murder site by the crime scene investiga *621 tors and the supporting. testimony which gave proper context to the relevancy of these items. This included the recently used bleach bottle found in the outside trash can, the bloody plastic bag discovered in the kitchen trash can, the misplaced kitchen knife, and the defendant’s DNA embedded under the fingernails of one of the murder victims.
The forensic evidence clearly demonstrated that the defendant’s partial palm print was discovered in Carisa’s blood on a plastic bag, which was recovered from the kitchen trash can shortly after the murders. The jury | inwas presented with expert testimony from Sgt. Danny Duddy of the Shreveport Police Department and Lt. Owen McDonnell of the Caddo Parish Sheriffs Office, both of whom matched the partial palm print on the bloody bag to that of the defendant. Their matches were confirmed by seven experts from other jurisdictions. The defendant’s contention that his prints might be on the bag because he had previously bought groceries for the house ignores the- fact that the print was found in fresh blood from Carisa who had just been brutally and viciously stabbed to death.
Likewise, the defendant attempts to explain away his DNA under Brian’s fingernails by arguing that'it was there because he and Brian had, at different times, each lived in the shed behind that Ellison home. Again, the defendant ignores obvious facts. Brian’s body showed evidence — i.e., an abrasion to his cheek and cuts on his hands — that he had fought back against his killer. At the time of his arrest, the defendant had marks on his arms that were consistent with fingernail scratches.
The defendant asserts that Kenneth should have been the prime suspect in the murders.[5] However, this contention was completely refuted by the evidence presented at trial. Kenneth testified that after working at his floor installation job all day, he returned home at about 5 p.m, Only his mother was home. After briefly speaking with her, Kenneth gathered some tools and left to work a side job grouting a floor. On his way home later, he stopped at a Circle K store to buy cigarettes and beer. Upon his arrival Inhome at about 9:30 p.m., he immediately noticed two oddities — that his mother had not turned on the porch light, as was her custom, and that the side door,- through which he usually entered with a:key, was open. The police were able to verify Kenneth’s alibi and whereabouts that evening. They even observed him making his purchases on the Circle K store security video and found the items he purchased in his mother’s room.
The prosecution established that the defendant had a failed romantic relationship with Carisa. Thereafter, he stalked and surveilled her, hiding in the bushes outside her family’s house and in the cemetery located across the street. The excessive brutality of her murder amply demonstrated that’ Carisa was the, primary target of the killer. The forensic evidence irrefutably' placed the defendant at the crime scene during the commission of the murders. When first questioned by the police, the defendant provided a false alibi (that he “never” left the hospital during his brother’s hospitalization from July, 15 to July 19), which was refuted by his own brother. He then claimed to have lost his cell phone on a bus on the day of the *622 murder, thus contradicting his own claim that he never left the hospital. In his second interview, he stated that he lost the phone the week before the murders; Examination of his phone records showed that there were four calls to Carisa’s phone on the day of the murders. The defendant originally downplayed his relationship with Carisa, claiming that they were merely good friends; he later admitted that the relationship was , sexual. In his first interview, he appeared agitated that Carisa refused to introduce him to her family and friends while he introduced her to his. He gave conflicting statements as to the last time he had been in the Ellison home. ■ In his first | ^interview, he initially said he had not been in the house in two months after being banned.by Irene. He then indicated that he had sex with Carisa at the house-a month before the murders. In the second interview, he said he had been there in the last two weeks and had sex with Carisa in her bed. He then said it might have even been the week before the killings. He gave the police the name of another man, supposedly Carisa’s former boyfriend, as a possible suspect; however, this man was determined to have an alibi for the time of the murders.
The defendant’s testimony — which was alternately contradictory or self-serving—did little to aid his defense.[6] Although he admitted to a 1973 conviction for aggravated rape on direct examination, he was impeached on cross-examination with additional felony convictions for simple escape and simple burglary. He testified that he and Carisa had a “secret affair.” He even stated that they were once secretly engaged for a month. (Apparently, their relationship was supposed to be a secret from Carisa’s mother.) He stated that he and Carisa built the shed behind the house and he lived there for a year. However, he moved out so Brian, who had been released from, prison, could move in. Although the defendant initially stated that he knew Brian, he then asserted that he never “really” met or talked' to him. Yet he was adamant that Brian was not Cari-sa’s boyfriend. While he admitted to “hanging out” around the cemetery and the side and front of the Ellison house, he denied hiding in the bushes. He denied lolling the victims but offered no explanation for the presence of his partial palm print in Carisa’s | isblood or his DNA under Brian’s fingernails. He claimed that the scratches on his arm were from pulling grass from a fence.
The evidence demonstrated that the defendant had perceived reasons for animosity toward each of the victims — Carisa, his former girlfriend with whom he had an unsuccessful relationship; Brian, Carisa’s current boyfriend who was living in the shed that the defendant helped build at the Ellison home and where the defendant had formerly lived; and Irene, Carisa’s mother, who banned him from her home for cutting an electrical cord to the shed while Brian was living in it and who was found tied to a chair with an electrical extension cord binding her hands behind her. The forensic evidence confirmed the defendant’s presence at the Ellison home at the time of the murders. The alibi initially provided by the defendant to the police was repudiated by his own brother. The defendant’s conversation with Ms. Davis mere days after the murders established that he possessed detailed information about the crime scene that had not been disseminated to the public. The defendant’s trial testimony was thoroughly impeached by the state. Therefore, we find that, viewed in the light most favorable to *623 the prosecution', the evidence presented at trial was sufficient to support the defendant’s convictions for the brutal murders of Carisa, Brian, and Irene.
These assignments of error are merit-less.
MOTIONS FOR MISTRIAL
In his. last two assignments of error, the defendant argues that the trial court erred in denying the two motions for mistrial he made under La. C. Cr. P. art. 775. One motion was made .during the trial, and the other was made after the jury had retired to begin deliberations.

Law

In relevant part, La. C. Cr. P. art. 775 provides:
A mistrial may be ordered, and in a jury ease the jury dismissed, when:
(3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a mattér of law;
Upon .motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
Mistrial is a drastic remedy which is authorized only where substantial prejudice will otherwise, result to the accused. State v. Roberson, 46,697 (La.App.2d Cir.12/14/11), 81 So.3d 911, writ denied, 2012-0086 (La.4/20/12), 85 So.3d 1270. The determination of whether actual prejudice has occurred lies within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. State v. Authier, 46,903 (La.App.2d Cir.4/25/12), 92 So.3d 494, writ denied, 2012-1138 (La.11/2/12), 99 So.3d 662; State v. Johnson, 50,005 (La.App.2d Cir.8/12/15), 175 So.3d 442.
Even if a mistrial was warranted, the failure to grant a mistrial would not result in an automatic reversal of the defendant’s conviction, but would be a trial error subject to the harmless error analysis on appeal. State v. Johnson, supra. Trial error is harmless where the verdict rendered is “surely unattributable to the error.” State v. Johnson, supra.
An accused in a criminal prosecution is guaranteed the right to confront and cross-examine the witnesses against him. Yeti the right of confrontation guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish. State v. Pierre, 2013-0873 (La.10/15/13), 125 So.3d 403; State v. Coleman, 13-942 (La.App. 5th Cir.5/14/14), 142 So.3d 130, writ denied, 2014-1224 (La.1/23/15), 159 So.3d 1056. Confrontation errors are subject to a harmless error analysis. State v. Cope, 48,739 (La.App.2d Cir.4/9/14), 137 So.3d 151, writ denied, 2014-1008 (La.12/8/14), 153 So.3d 440.
The rules for attacking or supporting the credibility of witnesses which are particularly pertinent in the instant case are found in La. C.E. arts. 607, 608, and 609.1. La. C.E. art. 607(A) allows the credibility of a witness to be attacked by any party, including the party calling him. La. C.E. art. 607(D)(1) states that a-party may attack the credibility of a witness by introducing extrinsic evidence to show the witness’s bias or interest. State v. Patterson, 50,305 (La.App.2d Cir.11/18/15), 184 So.3d 739, writ denied, 2015-2333 (La.3/24/16), 190 So.3d 1190. La. C.E. art. 608(B) provides that particular acts, vices, or courses of conduct of a witness may not be in *624 quired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness. The exceptions to this rule include conviction of crime as provided in La. C.E. art. 609.1, which decrees that every witness in a criminal case subjects himself to examination relative to his criminal convictions.
La.. C.E. art. 611 establishes that, while the parties control the order in which evidence is adduced, the trial court exercises “reasonable control over the mode and order of interrogating witnesses and presenting .evidence” in order to: (1) make the interrogation and presentation effective for the I,, (¡ascertainment of the truth; (2) avoid needless consumption of time; and (3) protect witnesses from harassment or undue embarrassment.
A criminal defendant has the constitutional right to present a defense. U.S. Const. amend. VI; La. Const. Art. I, § 16. This right is also subject to a harmless error analysis. State v. Cope, supra.
The district attorney is afforded considerable latitude in making argument to the jury. State v. Tucker, 49,950 (La.App.2d Cir.7/8/15), 170 So.3d 394. Further, a trial court has broad discretion in controlling the scope of closing arguments, State v. Casey, 1999-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000); State v. Tucker, supra. Even in the case of a prosecutor exceeding the bounds of proper argument, a reviewing court will not reverse a conviction unless thoroughly . convinced that the argument influenced the jury and contributed to the verdict. State v. Casey, supra; State v. Tucker, supra. Even where the prosecutor’s statements are improper, a reviewing court should accord, credit to the good sense and fair-mindedness of the jurors who heard the evidence. State v. Tucker, supra.

First Motion for Mistrial

The defendant’s first ' motion for mistrial' was made after the trial court sustained the state’s motion in limine to preclude the defense from questioning police detectives about Kenneth’s alleged drug usage or two small pieces of crack cocaine located in his bedroom during a search of the house after the murders. The state contended that, since the defense failed to question Kenneth about these issues during its cross-examination of him, they'were precluded from seeking the information from the detectives. The |17trial court partially agreed, finding that an attempt to question the detectives about Kenneth’s statements to the. police on the drug issues would be an improper attempt at impeachment. However, the trial court also ruled that the defendant could ask the crime scene investigator who found the drugs about their discovery. The. defendant moved for a mistrial under La. ¡C.. Cr. P. art. 775(3), arguing that defense counsel’s mistake in failing to question the witness about the issues on cross-examination should not be imputed to his client to deprive him of a fair trial. Although it denied the mistrial motion, the trial court granted the defense’s request for an instanter subpoena for Kenneth, allowing the defense to call him during its case. The trial court ruled that if Kenneth denied ownership of the drugs, he could be impeached with his prior inconsistent statements to the detectives admitting that the drugs were his.
On cross-examination of one of the crime scene investigators who searched and processed the Ellison residence, the defendant elicited testimony that she found two small rocks of suspected crack cocaine in an insulated lunch box in Kenneth’s bedroom. During the presentation of the defendant’s case, Kenneth was recalled to the stand. *625 He readily conceded ownership of the drugs and admitted that he had a conviction for possession of cocaine in about 1998, for which he successfully completed probation.
The defendant contends that by granting the state’s motion in limine, the trial court improperly limited the defendant’s cross-examination of the detectives and impinged on his decision on how to present a defense. He further contends that it denied him his right to confront the witnesses.
lisThe defendant failed to show that there was any legal defect in the proceedings which deprived him of his right to a fair trial, thus warranting a mistrial. Although aware of Kenneth’s drug use and the drugs found in his bedroom through pretrial discovery, the defendant failed to cross-examine Kenneth on these matters. The state made a motion in limine to prevent the defendant from thereafter attempting to improperly impeach Kenneth on these subjects through the testimony of the detectives. The trial court properly granted the motion. However, mindful of the defendant’s constitutional rights . of confrontation, the trial court carefully crafted a solution to fully preserve those rights. It issued a subpoena allowing the defendant to call Kenneth during the presentation of his own case, and it further ruled that the defendant could question the crime scene investigator about where the drugs were found. We find that the defendant has not demonstrated that he suffered any prejudice to his right of confrontation or his right to present a defense as the result of the trial court’s ruling. The trial court did not abuse its discretion in denying the defendant’s first motion for mistrial.

Second Motion for Mistrial

The defendant’s second motion for mistrial pursuant to La. C. Cr. P. .art. 775(3) was made at the conclusion of closing arguments. It was in response to remarks during the state’s closing argument which criticized the defense for: recalling Kenneth to the witness stand. The defense objected to the comment at the time it was made; the trial court sustained the objection. No motion for mistrial or request for an admonition to the jury was made at that time. The motion was not made until after the jury retired to deliberate. |19When it ruled upon the motion for mistrial, the trial court stated that it had sustained the defendant’s objection because the state’s comment was irrelevant, not because it was improper.
The defendant contends on.appeal that the trial court erred in denying his motion for mistrial. He asserts that the state’s comment in closing argument was improper because he was forced to recall Kenneth to the witness? stand due to the motion in limine filed by the state and sustained by the trial court. He further claims that the prosecutor’s remarks made it impossible for him to receive a fair trial.
There' is no showing that the state’s comment about Kenneth being recalled to the witness, stand- prejudiced .the defendant’s, right to a fair, trial. Furthermore, there is no basis for finding that the comment influenced the jury or contributed to its verdicts. We find that the trial court did not abuse its discretion in denying the defendant’s second motion for mistrial.
These assignments of error are without merit.
CONCLUSION
The defendant’s convictions and sentences are affirmed.
AFFIRMED.
BROWN, C.J., concurs with written reasons.

. The defendant and Brian were not related.

. The 911 call was introduced into evidence and played at trial, allowing the jury to hear Kenneth’s extreme emotional state when he discovered the bodies. We have also listened to the recording.

.The only lights that were on in the house when Kenneth returned home were in his mother’s bedroom. .

. The defendant made a similar statement to the police about Irene banning him from her home. During his testimony, he denied cutting the cord or ever being banned from the housé by Irene.

. In his appellate brief, the defendant' supports this claim by asserting that Kenneth was the "one person ... who was involved in the world of illegal drugs and drug dealers.” However, we are not aware of any evidence in this record suggesting that the murders were'related to drugs. The defendant further suggests in his brief that there had to be more than one killer, apparently based upon the mere fact that there were multiple victims.

. As fully documented on the record, the defendant chose to testify despite his counsel’s advice that it was not in his best interest to do so.