# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 19-56


**STATE OF LOUISIANA**

**VERSUS**

**ROMAN JOSEPH LASTRAPES**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 25778-15
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN E. CONERY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy H. Ezell, and John E. Conery, Judges.


**AFFIRMED.**

**Douglas Lee Harville**
**Louisiana Appellate Project**
**Post Office Box 52988**
**Shreveport, Louisiana  71135**
**(318) 222-1700**
**COUNSEL FOR DEFENDANT/APPELLANT:**
       **Roman Joseph Lastrapes**

**Roman Joseph Lastrapes**
**Louisiana State Prison**
**Camp C / Wolf 2**
**Angola, Louisiana  70712**
**PRO SE DEFENDANT/APPELLANT:**
       **Roman Joseph Lastrapes**

**John Foster DeRosier**
**District Attorney, 14th Judicial District**
**Karen C. McLellan**
**Shelley A. Deville**
**Assistant District Attorneys, 14th Judicial District**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, Louisiana  70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
       **State of Louisiana**

**CONERY, Judge.**

On November 5, 2015, Defendant, Roman Lastrapes, was charged by bill of indictment with the first degree murder of Linda Moore, perpetrated during the commission of an aggravated rape, in violation of La.R.S. 14:30(A)(1). Defendant sought and was granted a waiver of his right to jury trial and was ultimately tried and convicted by the trial court on March 27, 2018 of the first degree murder of Linda Moore. Defendant sought a new trial, which was denied after a hearing. Defendant waived delays, and the court proceeded to sentence him on June 8, 2018. Defendant received the mandatory sentence of life imprisonment at hard labor to be served without the benefit of probation, parole or suspension of sentence. Defendant, through counsel, now appeals his conviction and sentence. Defendant also filed a pro se appeal of the trial court's ruling denying him the right to withdraw his waiver and exercise his right to a jury trial. For the following reasons, we affirm.

## PROCEDURAL HISTORY

Defendant and his then attorney, Mr. Robert Shelton, filed a motion for speedy trial and a "Motion to Waive Trial by Jury," which were both signed on November 10, 2016, and set for a November 28, 2016 hearing. The "Motion to Waive Trial by Jury" included Defendant's signature and the following passage: "**ROMAN LASTRAPES,** defendant, further states that he fully understands his right to a trial by jury and thus waives right [sic] knowingly, voluntarily, and intelligently."

Defendant was not present at the November 28, 2016 hearing, but the trial court ordered the Clerk of Court to serve Defendant with certified copies of both motions. The attorneys and the trial court discussed the motion for speedy trial,

noting the time delays would begin to run, but Defendant's new January 17, 2017 trial date was within the time delays allowed for a speedy trial motion.[1] At no point was the "Motion to Waive Trial by Jury" discussed. The assistant district attorney present stated that the District Attorney's Office had not yet indicated whether it intended to seek the death penalty. However, a later minute entry, dated January 4, 2017, indicated that the district attorney's office had communicated to Defendant's previous attorney, Mr. Shelton, that the State would not seek the death penalty in this matter.

On December 1, 2016, the trial court granted the State's "Motion and Order to Fix Status Conference," setting the conference for December 12, 2016, to discuss a possible attorney conflict based upon Mr. Shelton's relationship to the victim. At the December 12, 2016 hearing, Mr. Shelton withdrew from representing Defendant based upon Mr. Shelton's relationship to the family of the victim. Additionally, the trial court ruled it would hold all filed motions in abeyance so that subsequent counsel could decide which motions he or she would like to adopt.

The record reflects that Mr. Richard White from the public defender's office assumed Defendant's defense in July 2017. Subsequently, Defense counsel requested two continuances, which the trial court granted. The case was rescheduled for trial on March 27, 2018.

On March 26, 2018, one day before the bench trial was scheduled to begin, Defendant and defense counsel sought to withdraw Defendant's jury trial waiver and sought a jury trial. Louisiana Code of Criminal Procedure Article 780(D)

---

[1] The transcript for pre-trial hearings held on October 3, 2016, November 28, 2016, and December 12, 2016, were introduced as an in globo exhibit on the first day of Defendant's trial, March 27, 2018.

specifically states, "A waiver of trial by jury is irrevocable and cannot be withdrawn by the defendant."

Defense counsel argued that Defendant had waived his right based upon the advice of Mr. Shelton,[2] that neither Defendant nor present defense counsel knew the strategic reason Mr. Shelton believed it was in Defendant's best interest to do so, and Defendant's present counsel did not agree with the decision to waive jury trial. The trial court deferred ruling on the mode of trial until the following day so that transcripts of prior pre-trial hearings held on October 3, 2016, November 28, 2016, and December 12, 2016, could be reviewed.

On March 27, 2018, the trial court ruled Defendant's trial would commence as a bench trial, noting Defendant's waiver filed in November of 2016 was in proper form and was irrevocable under La.Code Crim.P. art. 780(D). Defense counsel objected, again noting he could not determine why Defendant's former counsel, Mr. Shelton, felt a bench trial would be in Defendant's best interest.

Defendant's bench trial then began, and at the conclusion of the trial on March 29, 2018, the trial court found Defendant guilty of the first degree murder of Linda Moore stating in part:

> The totality of the evidence, both circumstantial and scientific, exclude every reasonable hypothesis. The Court is convinced beyond a reasonable doubt that the defendant is responsible for the death of Linda Moore and as such he will be found guilty of first degree murder. As per Article 814 we need to -- or 873 -- I need to set a sentencing date.

On June 8, 2018, Defendant filed a "Motion for New Trial," once more arguing his trial should have been a jury trial because the tactical reasoning for initially waiving his right to a jury trial was lost when Mr. Shelton died. He also

---

[2] Mr. Shelton was deceased at the time of Defendant's trial, having passed away in August 2017.

asserted "it was particularly important that Defendant's female peers constitute part of such jury. Terry Welke, M.D., coroner for Calcasieu Parish, Louisiana, and clearly a witness with unmistakably pro-prosecution proclivities, offered certain evidence that likely would have been viewed as borderline absurd if heard by female jurors." Defendant summarized his argument by stating he was denied the effective assistance of counsel and his jury trial waiver should not have been considered irrevocable, despite the clear and unambiguous language of La.Code Crim.P. art. 780(D), because new counsel disagreed with prior counsel's strategy.

At the hearing on the Motion for New Trial held the same day, defense counsel argued a bench trial adversely affected his ability to represent Defendant, "I feel like I ended up trying the case with one hand tied behind my back as a result, and I respectfully contend, Your Honor, that, consequently, Mr. Lastrapes was denied -- effectively denied right to counsel."

The trial court denied the motion for new trial and defense counsel objected; however, Defendant waived delays and proceeded to sentencing. Defendant was sentenced to "life imprisonment at hard labor without benefit of probation, parole or suspension of sentence."

Defendant now appeals his conviction and sentence. Through counsel, Defendant contends there was insufficient evidence to convict him, particularly arguing the State failed to prove Linda Moore's murder was not committed by either Paul Delafosse or Marlin Jenkins. Defendant raises an additional claim pro se that his right to a jury trial was denied when the trial court refused to allow Defendant to withdraw his waiver of jury trial. Defendant contends "he did not knowingly and intelligently waive his right to a jury trial." For the following reasons, this court affirms Defendant's conviction and sentence.

4

**FACTUAL BACKGROUND**

Charles Hunter, Jr., Chief Investigator for the Calcasieu Parish Coroner's Officer with thirteen years of experience, was the first witness to take the stand. The court accepted Mr. Hunter as an expert in the field of death investigations without objection. He testified he was assigned to the crime scene once the coroner's office was informed Linda Moore's body had been found. Mr. Hunter identified numerous photographs he had taken of the scene. Mr. Hunter testified that based on blood found in multiple areas between the street and where the victim's body was found, it was his opinion Ms. Moore was attacked outside of the alleyway and forced into the alleyway by her attacker.

Based upon the liquidity of bodily fluid which was located on Ms. Moore's buttocks, Mr. Hunter testified he believed the victim's body had not moved since said bodily fluid was deposited. Mr. Hunter noted he took a swab of the fluid which was subsequently sent off for DNA testing. Mr. Hunter noted there were blue jeans laid on the ground directly in front of Ms. Moore's body, which he felt were likely placed there so that her assailant could sexually assault her without injuring his knees. Mr. Hunter also noted there was broken glass on the ground near the victim's body. He further testified that there was residue on Ms. Moore's hands which matched the nearby shed, likely an indication of a struggle.

Mr. Hunter testified Ms. Moore had a number of facial injuries consistent with blunt force trauma from a fist and noted the evidence indicated she was still alive and breathing when she sustained her injuries, which included a fracture of her nose where the bone was actually exposed. He also noted there was a linear pattern on Ms. Moore's face that was consistent with her sweatshirt being pulled over her head and no movement from where she was assaulted. Mr. Hunter also

noted there were broken bottles and pools of blood on the ground, which became visible once Ms. Moore's body had been removed, indicating she did not move from that location and she did not willingly lay down on the ground.

Mr. Hunter testified that he would expect the assailant would have abrasions or lacerations on his hands if he indeed used his fists to assault Ms. Moore. He again confirmed his opinion that Ms. Moore's body did not move from where she was beaten. He further opined Ms. Moore was likely incapacitated from her injuries.

On cross-examination, Mr. Hunter testified there was no evidence Ms. Moore's body was dragged at any point. Mr. Hunter acknowledged he was at some point informed the name Marlin Jenkins had become a part of the investigation, but noted he never interviewed Mr. Jenkins, nor could he have picked him out of a lineup. Mr. Hunter testified he did not believe Ms. Moore's body was posed for effect. He then reiterated the placement of the body, the state of Ms. Moore's clothing, and the bodily fluid dripping down her buttocks was consistent with her being sexually assaulted in the exact location where she was found.

Dr. Terry Welke, the coroner for Calcasieu Parish, was accepted as an expert in forensic pathology. Dr. Welke testified that Ms. Moore's death was a homicide resulting from blunt force injuries of the head. Dr. Welke testified as to the contents of his autopsy report, which included the following description of facial injuries:

> Lacerations (skin tears) are: on the mid-forehead, 1-3/8 inches; between the eyes, 1/8-inch; left bridge of nose, V-shaped, 3/8 x 3/8-inch; mid-portion of the lower lip, 3/16-inch. Bruises involve: right forehead; left and right, eye orbits; left jaw. Abrasions (scrapes) involve: mid-forehead, 1-1/2 x ¾-inch in greatest dimension; outside

of the left eyebrow, 3/8 x 3/16-inch. There are numerous broken bones (fractures) of the face: nasal bone; left and right eye orbits; maxilla (bony portion of upper mouth holding the teeth). As a result of the aforementioned injuries, there are bruises involving the white portion (sclera) of each eye. Internally: Pink foam is in the voice box (larynx); blood is in the windpipe and lower airways (trachea/bronchi); the lungs are heavy and blood-filled; blood is in the stomach. Blood is present on the undersurface of the scalp overlying the back of the head (occiput); the injury is predominantly greater on the right side.

Dr. Welke also noted he found "intact non-motile sperm" in Ms. Moore's vagina. He opined that indicated sexual activity was relatively recent, as sperm only remain intact for around sixteen hours in a live person, and Dr. Welke noted the time would be lessened for someone who died shortly after intercourse. When asked how he believed Ms. Moore died, Dr. Welke opined:

> In my mind's eye I felt that there was an assault, meaning a physical assault of some -- near the scene, and then Ms. Moore had become incapacitated but still alive, and, basically, placed on the ground or fell backwards on the ground, and then additional injuries occurred to her face, and then the sexual activity occurred. And I felt that due to the position of the body that the legs were probably over the shoulders of the assailant, and then after the orgasm had occurred, the assailant basically had taken Ms. Moore's legs and then basically pushed them off his shoulders, and then that's why they were in the position of being on the wall.

When asked if he thought someone could have left the semen in Ms. Moore in a different location, Dr. Welke responded "I say the attack occurred at the scene." He also stated that it was his expert opinion the person who deposited the seminal fluid in Ms. Moore was the person who attacked her.

The next witness to take the stand was Mr. Owen McDonnell, who was accepted as an expert in the fields of crime scene analysis and blood stain pattern. Mr. McDonnell testified he owns a forensic consulting company and has worked on cases for both prosecutors and defense attorneys, as well as having worked on cases for the Innocence Project. He testified the Calcasieu Parish District

Attorney's Office contacted him to "determine how many assailants were present in that specific area the body was found at the time that the blood was being dispersed." Mr. McDonnell testified that his expert opinion was the blood splatter patterns indicated no one was present in the area where Ms. Moore was beaten aside from herself and her attacker.

The State then called Ms. Shakena Ardoin, who testified she had a friendly relationship with Defendant in January of 2010. She testified she remembered getting into an argument with Defendant early one morning in January after he woke her up by banging on her door. Defendant told her he wanted to stay at her place because he had just been in a fight, but he would not tell her with whom he fought. Ms. Ardoin could not give a specific date, but noted it was early January 2010. She testified she went to bed, Defendant stayed in the living room, and he was gone when she woke up. Ms. Ardoin acknowledged previously giving a statement to law enforcement and telling Detective Franklin Fondel that Defendant was acting frantic or hysterical when he arrived at her door.

Although Ms. Ardoin recalled telling Detective Fondel that Defendant had left a pair of shoes and a jacket at her home, she stated it was actually only his jacket. She testified the jacket had spots of blood on it, but she dismissed it as a result of the fight Defendant had mentioned. She did not recall telling Detective Fondel that Defendant's shoes also had blood on them. Ms. Ardoin noted she put Defendant's jacket in a bag and brought it to his grandmother. She recalled Defendant's knuckles being scraped when he came to her house and stated someone at her aunt's house had informed her a dead body was found not far from her home the same morning. She testified she told Detective Fondel that she "'hope[d] [Defendant] didn't have anything to do with [the dead body.]'"

8

On cross-examination, Ms. Ardoin reiterated she did not recall the exact date Defendant showed up at her home in the early morning hours with blood on his clothes and scrapped knuckles claiming to have been in a fight. She did not recognize the name Marlin Jenkins. She testified she was worried about herself and her children when she spoke to Detective Fondel; however, she also stated her fear did not affect her statements to him. Ms. Ardoin acknowledged that she had had an "off and on" physical relationship with Defendant in 2010, they were still friendly and spoke while he was in jail, and the only reason she was testifying was because she was subpoenaed.

On re-direct examination, Ms. Ardoin testified Defendant's jacket was white, that it was not uncommon for Defendant to get into fights, and Defendant's mother had brought her to the courthouse to testify.

The State then called Ms. Monica Quaal, the DNA Technical Leader at the Southwest Louisiana Crime Lab. Ms. Quaal was accepted as an expert in the fields of forensic DNA and serology. Ms. Quaal testified that she performed DNA testing in this case and noted DNA was found under one of Ms. Moore's fingernails that matched Mr. Paul Delafosse. Ms. Quaal testified that she tested the victim's panties, which did not contain any semen. Noting that an unidentified male profile was obtained from the semen sample recovered from Ms. Moore's buttocks, Ms. Quaal testified the profile eventually identified a possible match in the CODIS database. Ms. Quaal testified she compared the previously unidentified profile with the genetic profile of Defendant and stated there was a "one in 591 quadrillion" chance the semen on the victim did not come from Defendant. She noted the sperm recovered from Ms. Moore's vagina had identical odds of not being Defendant's.

On cross-examination, Ms. Quaal stated Mr. Jenkins was excluded as a possible source of any DNA recovered from Ms. Moore's body; however, Mr. Delafosse was the source of the DNA recovered from underneath one of Ms. Moore's fingernails. She also noted law enforcement provided a DNA sample from Mr. Delafosse, which allowed her to make the match. She could not explain how, if Ms. Moore's assailant beat her to death with his fist, there was no DNA from the assailant on Ms. Moore's face. She did, however, note there were a lot of factors which could affect how much, if any, DNA would result from normal skin-to-skin contact.

The State's final witness was Sergeant Franklin Fondel of the Lake Charles City Police's detective division. Sergeant Fondel noted he had been in law enforcement for a little more than twenty years. He noted he had been a detective for over seventeen years and had been involved in over a hundred murder investigations. Sergeant Fondel testified he responded to a report of a dead body behind Thib's Paint & Body Shop on the corner of Shattuck and Belden Streets at approximately 8:52 a.m. on January 15, 2010. Sergeant Fondel testified he was able to identify the victim through a "My Choice" casino card she had in her wallet.

Sergeant Fondel stated that both Marlin Jenkins and Paul Delafosse were investigated as persons of interest, but were ultimately excluded as suspects. He noted, however, the CODIS hit occurred in August 2010, which is when he began investigating Defendant. Sergeant Fondel testified Defendant had no visible reaction to being told his DNA was found inside a murder victim.

Sergeant Fondel stated that when he interviewed Shakena Ardoin, she told him that when Defendant came to her home banging on the door, he had blood on

10

his jacket and all over his white shoes. Noting Ms. Ardoin's testimony that someone told her about the body found in the Sunlight Manor area the same day Defendant showed up at her home, Sergeant Fondel testified that he checked reports and that there were no other bodies found in that area in January of 2010.

On cross-examination, Sergeant Fondel stated the name Marlin Jenkins first came up in the investigation on January 18, 2010. He stated Mr. Jenkins's name arose from interviews with a few prostitutes and "a kid that was at the bus stop." He noted the young man at the bus stop was named Logan Richard, who described seeing someone who matched Mr. Jenkins's description near Thib's Paint & Body around 6:10 or 6:15 a.m. the morning Ms. Moore died. He acknowledged that his affidavit in support of a no-knock search warrant for Mr. Jenkins stated he was informed Ms. Moore worked as a local prostitute and included the following statement, "While interviewing several other prostitutes, it was discovered that a black male identified as Marlin Jenkins had beaten at least six other prostitutes and had raped two of the six." Sergeant Fondel testified Mr. Jenkins became upset and began to cry during his interview. He testified Mr. Jenkins was excluded as a suspect because his DNA did not match any of the samples recovered from the murder scene.

Sergeant Fondel testified Mr. Delafosse's name initially arose through interviews with the victim's sisters, one of whom mentioned Mr. Delafosse picking Ms. Moore up from her house. He noted Mr. Delafosse was with the victim hours before her death at the EZ Aces Casino on Belden Street. He then stated he did not recall Mr. Delafosse's DNA being found near Ms. Moore or on her body. After the CODIS match came back in August of 2010, Sergeant Fondel was able to obtain a DNA sample from Defendant, who was incarcerated at Angola at the time.

11

Sergeant Fondel testified the shoes and jacket Shakena Ardoin described were never recovered.

On re-direct, Sergeant Fondel testified that he knew from speaking with Mr. Hunter and Dr. Welke early on that whoever left semen in the victim was the person who murdered her; therefore, he expected Marlin Jenkins's DNA to match. He noted that although Mr. Richard saw Mr. Jenkins near the crime scene around 6:15 a.m., the coroner concluded Ms. Moore was likely murdered around 4:30 a.m. He reiterated that no forensic evidence connected Marlin Jenkins to Ms. Moore; furthermore, he noted they were able to corroborate Mr. Delafosse's story of what happened that night so as to exclude him as a suspect. Following Sergeant Fondel's testimony, the State rested its case.

After the court denied a motion for acquittal under La.Code Crim.P. art. 778, noting both circumstantial evidence and scientific evidence submitted by the State supported a conviction, defense counsel called Ms. Mary LeDoux, Defendant's mother, to the stand. She testified that in early 2010, Defendant spent most nights at either her home or her mother's home. She stated Shakena Ardoin was Defendant's girlfriend at that time. She then stated, "I really don't know where he would spend the night, but I'm pretty sure he [stayed at Ms. Ardoin's home] a couple of times." Ms. LeDoux testified Defendant would typically come home before 2:00 a.m. She could not remember whether Defendant had a white jacket or what type of shoes he typically wore at the time of the murder. She then stated Defendant always wore black shoes. On cross-examination, Ms. LeDoux testified she had "no idea where [Defendant] was at the time of [Ms. Moore's] murder."

Defendant then took the stand in his own defense. Noting that his birthday is January 6, Defendant stated his hands were roughed up when he went to Ms.

12

Ardoin's house because he was "in a fight a couple of days after [his] birthday." Defendant stated the night of the murder, he was at the Booker T. Apartments around 8:00 p.m., having sex with Ms. Quinn Thomas. Although unclear exactly what time he left, Defendant stated he left Ms. Thomas's home alone and eventually came into contact with Ms. Moore while walking down Goos Street. Defendant stated Ms. Moore asked if he "was working," which he clarified meant she was asking if he had any crack cocaine, as his "work" was selling said drug. Upon telling her he was working, Defendant testified she called him onto the porch where she was sitting. He then testified that she wanted to trade sexual favors for crack, to which he agreed. Defendant testified he gave the victim a crack rock, she smoked part of it, then they had sex inside the residence.

Defendant testified once they finished having sex, she gave him a rag to clean up, she did the same, and then she finished smoking the crack before walking him out of the house, stating they were in the bathroom together around twenty minutes. Defendant testified there was a man waiting outside the house when they exited, who began "fussing with" Ms. Moore; Defendant left while they were on the porch yelling at each other. He stated he could not understand the man because "[h]e sounded like he, uh -- like he retarded." Nonetheless, he remembered the man telling Ms. Moore to "hurry up."

Defendant stated he continued walking away, noting he sold a few more crack rocks to a few prostitutes and a couple of men, though Defendant could only name one, a prostitute named Tiffany. Defendant testified he sold the last of the rocks he had on him at the apartments on Third Street and Fifth Avenue, but could not give any indication of what time it was. He then stated he would probably have gone to Ms. Ardoin's house because it was the only place he could go on

13

foot, noting he did not have a car. Defendant testified that he did not own a white jacket and that he wore black suede Jordans at the time, claiming he only wears dark clothes.

Defendant then testified the first time he found out about Ms. Moore's death was when Sergeant Fondel questioned him in August of 2010. He stated he did not recognize the name at all until they showed him a picture of the victim. He acknowledged telling Sergeant Fondel that "'[a]nything could have happened to her after I fucke[3] her.'" He stated he was so callous because he was starting to lose his temper with Sergeant Fondel insinuating he had murdered the victim. Defendant noted he had prior convictions for simple robbery, theft over $500, being a convicted felon in possession of a firearm, possession of marijuana, and flight from an officer.

Defendant stated that he never left shoes or a jacket at Ms. Ardoin's house because he would have had to leave her house barefoot with no jacket. He testified they were still friendly, as she was the mother of his three kids, and she visited him nearly every week. Defendant stated that when he stayed at Ms. Ardoin's home overnight, the time at which he would depart varied, though he would sometimes leave around noon. Although he admitted he recognized exactly where Ms. Moore's body was from photos, he testified he did not usually go to that area. He testified he did not beat Ms. Moore to death.

On cross-examination, Defendant again confirmed his prior criminal convictions. Acknowledging his brother previously worked at Thib's, Defendant testified he was not familiar with the building behind which Ms. Moore's body was found. Defendant reiterated that the night Ms. Moore died was the first time he

---

[3] The language of the transcript has not been altered in any manner.

had sex with her. He stated it was still before midnight when he left Ms. Moore arguing with an unknown male. Defendant contended he told police in his initial statement that he left while Ms. Moore was arguing with an unknown male and that he picked out the person from a photo lineup. Despite Defendant telling law enforcement during his initial interview that he recognized numbers one and four from the lineup, he testified at trial that it was definitely number five, Mr. Marlin Jenkins. Both parties discussed what the Defendant said in his initial interview, in which he did not identify Mr. Jenkins as the man who was arguing with Ms. Moore. However, neither the video nor a transcript of Defendant's initial interview was introduced into evidence at trial and, therefore, is not a part of the record.

Although Defendant did not actually remember staying at Ms. Ardoin's, but believed he had, he nonetheless stated he would not have left before she woke up because they would sleep together, and he could "barely get out of the bed without her waking up." Defendant essentially argued that everything Ms. Ardoin testified to was false: he did not show up frantic banging on her door, he never slept on the couch, he did not leave before she woke up, and he never had blood on his shoes. Defendant acknowledged telling Sergeant Fondel that Ms. Thomas had dropped him off and picked him up from Fifth Avenue, contrary to his prior testimony regarding the lengthy distances he walked.

After being unable to find a possible alibi witness to subpoena to obtain her testimony, the Defense rested. Following closing arguments, the court returned its verdict, stating its oral reasons, in pertinent part:

> The defendant's version, he admits that there was a sex act, but his location would be a physical impossibility based on the scientific evidence that was in fact submitted and received both on the victim and the clothing of the victim. I do find his testimony to be self-serving and incredulous in that aspect.

15

The totality of the evidence, both circumstantial and scientific, exclude[s] every reasonable hypothesis. The Court is convinced beyond a reasonable doubt that the defendant is responsible for the death of Linda Moore and as such he will be found guilty of first degree murder. As per [La.Code Crim.P.] Article 814 we need to -- or 873 -- I need to set a sentencing date.

Defendant now timely appeals his conviction and sentence, asserting one assignment of error through counsel and one assignment of error through a pro se brief filed by the Defendant.

## ASSIGNMENTS OF ERROR

Defendant submits the following counseled assignment of error:

There was insufficient evidence to prove that Roman Joseph Lastrapes was guilty beyond a reasonable doubt.

Defendant submits the following pro se assignment of error:

Appellate's [sic] constitutional rights were violated by the trial court when he did not knowingly and intelligently waive his right to a jury trial.

## LAW AND DISCUSSION

### Errors Patent

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there is a potential error patent regarding Defendant's waiver of jury trial. This error is raised in Defendant's pro se brief and will be addressed as an assigned error.

### Counseled Assignment of Error: Sufficiency of the Evidence

In his sole counseled assignment of error, Defendant contends there was insufficient evidence to support his conviction for first degree murder. Specifically, Defendant contends the State failed to prove Ms. Moore was not murdered by either Mr. Paul Delafosse or Mr. Marlin Jenkins. We find that this assignment of error lacks merit.

16

The analysis for insufficient-evidence claims is well settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Defendant was convicted of first degree murder, in violation of La.R.S. 14:30(A)(1), defined as the killing of a human being:

When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, assault by drive-by shooting, first degree robbery, second degree robbery, simple robbery, terrorism, cruelty to juveniles, or second degree cruelty to juveniles.

Defendant was accused of killing Ms. Moore during the commission of an aggravated rape. At the time of Ms. Moore's death, aggravated rape was relevantly defined under La.R.S. 14:42(A)(1) as a rape where the "anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed . . . [w]hen the victim resists the act to the utmost, but whose resistance is overcome by force." Accordingly, the State was required to prove Defendant killed Ms. Moore while acting with specific intent to kill or to inflict great bodily harm while perpetrating a rape in which the victim's resistance

17

was overcome by force. Considering the expert testimony and evidence submitted at trial, the State has met its burden.

Both Mr. Hunter and Dr. Welke, accepted as experts in their fields, opined that a struggle resulted in Ms. Moore being beaten until she was incapacitated and unable to move. Both believed she was then raped and left unresponsive on the ground with her genetalia exposed and her feet propped against the wall following her assailant pushing her legs off his shoulders once he had achieved an orgasm. Dr. Welke also testified that Ms. Moore was definitely raped in the same location where she was discovered; both men believed whoever raped Ms. Moore was the individual who killed her.

Mr. McDonnell, accepted as an expert in the fields of crime scene analysis and blood stain pattern, testified that, in his opinion, there could have only been one person attacking Ms. Moore. Ms. Quaal, accepted as an expert in DNA analysis, testified the sperm recovered from inside Ms. Moore's vagina and off her buttocks belonged to Defendant. There was no mention of any other contributors.

In *State v. Rubin*, 16-456 (La.App. 3 Cir. 2/1/17), 211 So.3d 532, *writ denied*, 17-406 (La. 12/15/17), 231 So.3d 641, this court found sufficient evidence to sustain a first degree murder committed during the perpetration of an aggravated rape. In *Rubin*, the evidence consisted of the defendant's DNA being recovered from inside of the victim, who was found naked in her apartment with over thirty knife wounds. This court affirmed the conviction, despite multiple expert witnesses refusing to say the victim had, in fact, been raped. We find the evidence in the current case is significantly greater than in *Rubin*. Whereas *Rubin* was a nearly thirty-year old cold case, law enforcement matched Defendant's DNA to the sperm found in and on Ms. Moore within a year of her death. Multiple experts

18

testified she was beaten to the point of incapacitation, was raped, and then subsequently died without ever having moved from where said rape occurred. As recently noted by the second circuit:

> Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). As a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances of the offense and the defendant's actions. *State v. Thornton,* 47,598 (La.App. 2 Cir. 3/13/13), 111 So.3d 1130. Specific intent to kill or inflict great bodily harm may be inferred from the extent and severity of the victim's injuries.

*State v. Wilson*, 50,589, pp. 8-9 (La.App. 2 Cir. 5/18/16), 196 So.3d 614, 620, *writ denied*, 16-1102 (La. 5/12/17), 221 So.3d 72.

Based on the record on appeal, the State proved beyond a reasonable doubt that Ms. Moore was the victim of a first degree murder during the perpetration of an aggravated rape. The extent and severity of her injuries indicate her resistance was overcome by force and further illustrate specific intent to kill or inflict great bodily harm. The only question, then, becomes the identity of her murderer. Defendant's trial defense was that it could have been one of the two other suspects who were investigated prior to the CODIS hit on the sperm recovered from the victim. Defendant again raises the same argument to this court, which we find unpersuasive.

As there were no eyewitnesses to the attack on Ms. Moore, Defendant's conviction is based, at least in part, upon circumstantial evidence. As such, this court notes the following language from *State v. Captville*, 448 So.2d 676, 680 (La.1984):

> When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is

19

guilty unless there is another hypothesis which raises a reasonable doubt. An evaluation of the reasonableness of other hypotheses of innocence provides a helpful methodology for determining the existence of a reasonable doubt. As we have recognized in such cases as *State v. Wright,* 445 So.2d 1198 (La.1984), *State v. Graham,* 422 So.2d 123 (La.1982), and *State v. Sutton,* 436 So.2d 471 (La.1983), the court does *not* determine whether another *possible* hypothesis has been suggested by defendant which *could* explain the events in an exculpatory fashion. Rather, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether the alternative hypothesis is sufficiently reasonable that a rational juror could not "have found proof of guilt beyond a reasonable doubt". *Jackson v. Virginia,* [443 U.S. at 324].

Although Defendant was convicted by a judge, not a jury, he nonetheless took the stand in his own defense and attempted to argue that after he had consensual sex with the victim, he left while she was arguing with Marlin Jenkins. His identification of Mr. Jenkins from a photographic lineup, however, was contrary to his previous viewing of the same lineup in 2010, when he identified multiple other individuals as possibly being the person he saw arguing with Ms. Moore. The trial court did not rely on Defendant's 2010 initial interview testimony, which was not submitted into evidence at trial, where Defendant, contrary to his testimony at trial, was unable to identify Mr. Jenkins as the man arguing with Ms. Moore. Defendant's exculpatory evidence concerning the identity of Mr. Jenkins was called into doubt by the lack of any DNA evidence linking Mr. Jenkins to the crime scene and the murder of Ms. Moore. Additionally, his attorney in his opening and closing statements argued law enforcement did not do enough to exclude Mr. Delafosse as a potential suspect. The finder of fact rejected Defendant's testimony as "self-serving and incredulous."

Defendant argued two hypotheses to explain Ms. Moore's death in an exculpatory fashion. However, neither hypothesis "is sufficiently reasonable that a rational [judge] could not 'have found proof of guilt beyond a reasonable doubt.'"

20

*Id.* There was no evidence connecting Mr. Jenkins to the murder. Although a single eyewitness had claimed to see Mr. Jenkins in the area near where Ms. Moore was found at 6:15 a.m., Dr. Welke testified she likely died around 4:30 a.m. Furthermore, there was no DNA evidence to connect Mr. Jenkins to the actual crime scene in any fashion.

As for Mr. Delafosse, while his DNA was located under a single fingernail of the victim, there was no other evidence to connect him to the murder. Law enforcement investigated Mr. Delafosse and eventually excluded him as a suspect; no evidence or testimony was presented to support Defendant's contention that Mr. Delafosse could have been responsible.

Given the expert testimony that a single assailant attacked Ms. Moore, beat her until she was incapacitated, raped her, and left her to die in the same location and in the same state she was in when raped, and Defendant's sperm being both inside her vagina and dripping down her buttocks, the evidence was more than sufficient for a rational trier of fact to find Defendant guilty beyond a reasonable doubt when viewed "in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319.

### *Defendant's Pro Se Assignment of Error: Right to a Jury Trial*

In his sole pro se assignment of error, Defendant "contends that his United States Constitutional rights were violated when he was not allowed to have a trial by jury." Defendant contends his attorney "made a decision to file the Motion to Waive Trial by Jury on his own." Additionally, he asserts his attorney did not consult with him "before making such a drastic decision." Nevertheless, both of these claims are contradicted by the record before this court.

The right to waive a jury trial is encapsulated in La.Code Crim.P. art. 780:

21

A. A defendant charged with an offense other than one punishable by death may knowingly and intelligently waive a trial by jury and elect to be tried by the judge.

B. The defendant shall exercise his right to waive trial by jury in accordance with Article I, Section 17 of the Constitution of Louisiana. The waiver shall be by written motion filed in the district court not later than forty-five days prior to the date the case is set for trial. The motion shall be signed by the defendant and shall also be signed by defendant's counsel unless the defendant has waived his right to counsel.

C. With the consent of the district attorney the defendant may waive trial by jury within forty-five days prior to the commencement of trial.

D. A waiver of trial by jury is irrevocable and cannot be withdrawn by the defendant.

Defendant correctly contends he was not present in court when the "Motion to Waive Trial by Jury" was presented to the court; however, Defendant's presence is not necessary. The code article anticipates a written waiver, and Defendant signed said written waiver prior to its presentation to the court. As noted in *State v. Edwards*, 13-665, p. 4 (La.App. 4 Cir. 1/22/14), 133 So.3d 132, 135, *writ denied*, 14-383 (La. 9/26/14), 149 So.3d 259:

> A defendant need only know and understand that the choice confronting her is, "on the one hand, to be judged by a group of people from the community, and on the other hand, to have her guilt or innocence determined by a judge." *State v. Bazile,* 12–2243, p. 17 (La.5/7/13), [144] So.3d [719, 733], 2013 WL 1880395. If a defendant understands that choice, her jury waiver is deemed knowing and intelligent. *See id.,* 12–2243 at p. 18, [144] So.3d at [733]. No greater proof of knowing and intelligent waiver is constitutionally or jurisprudentially required. *See State v. Johnson,* 389 So.2d 1302, 1304-1305 (La.1980). Additionally, in reviewing a defendant's claim that her waiver of trial by jury was not knowing or intelligent, we do not consider the strategic considerations, motivations, or benefits underlying a defendant's waiver, but instead restrict ourselves solely to the issue of her knowledge. *See Bazile,* 12–2243 at p. 18, [144] So.3d at [733].

Accordingly, Defendant's contention that he did not understand the strategy behind waiving a jury trial is irrelevant. In light of *Edwards* and *Bazile*, Defendant's knowledge of trial counsel's strategy is not a proper consideration.

Additionally, Defendant contends that he could not waive his right to a jury trial because he was charged with first degree murder and Defendant argues the case remains a capital case even if the district attorney does not seek the death penalty. Once again, we find that this argument lacks merit. Under La.R.S. 14:30(C)(2), it is clear that a first degree murder case where the death penalty is not sought does not constitute a capital offense:

> If the district attorney does not seek a capital verdict, the offender shall be punished by life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The provisions of Code of Criminal Procedure Article 782 relative to cases in which punishment is necessarily confinement at hard labor shall apply.

The statute is clear: if the district attorney does not seek the death penalty, as was the situation in this case, the case is not considered a capital case. Prior to 2019, La.Code Crim.P. art. 782 stated that a capital case was to be tried before a twelve member jury, all of whom must concur to return a verdict; cases where punishment was necessarily confinement at hard labor required a twelve member jury, only ten of whom had to concur. A conviction for any crime committed after January 1, 2019, requires a unanimous verdict. *See* 2018 La. Acts No. 493, § 1.

Following Defendant's argument that first degree murder is a capital case even if the death penalty is not sought, no defendant could be found guilty by a non-unanimous jury in any first degree murder case. This argument is without merit. *See State v. Bishop*, 10-1840 (La.App. 1 Cir. 6/10/11), 68 So.3d 1197, *writ denied*, 11-1530 (La. 12/16/11), 76 So.3d 1203.

23

Furthermore, this court has previously rejected the exact argument Defendant is now raising. In *State v. Lewis*, 09-846 (La.App. 3 Cir. 4/7/10), 33 So.3d 1046, *writ denied*, 10-967 (La. 11/24/10), 50 So.3d 825, the defendant argued his two convictions for first degree murder, returned after a bench trial, were invalid because he could not waive his right to a jury trial. In *Lewis*, the State actually initially sought the death penalty, then reversed course and opted not to seek capital punishment; the defendant waived his right to a jury trial after the State took the death penalty off the table. This court affirmed the defendant's convictions, noting he suffered no prejudice since the death penalty was not a possible punishment and the defendant actually requested a bench trial. Although Defendant attempted to withdraw his waiver of his right to a jury trial in the instant case, the fact remains he was not facing the death penalty and he signed the waiver requesting a bench trial. Defendant's argument lacks merit.

## CONCLUSION

Defendant's conviction and sentence are affirmed.

**AFFIRMED.**

24