STATE OF LOUISIANA

VERSUS

PRESS SHORTER, III

NO. 23-KA-128

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 18-5871, DIVISION "O"
HONORABLE DANYELLE M. TAYLOR, JUDGE PRESIDING

November 29, 2023

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and Marc E. Johnson

**AFFIRMED; REMANDED FOR CORRECTION OF THE UNIFORM**
**COMMITMENT ORDER**

    **JGG**

    **FHW**

    **MEJ**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Lalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
      Honorable Paul D. Connick, Jr.
      Thomas J. Butler
      Darren A. Allemand
      Joan Benge
      Tucker H. Wimberly

COUNSEL FOR DEFENDANT/APPELLANT,
PRESS SHORTER, III
      Justin C. Harrell

**GRAVOIS, J.**

Defendant, Press Shorter, III, appeals his conviction and sentence for manslaughter in violation of La. R.S. 14:31.  On appeal, he argues that the trial court erred when it restricted his cross-examination of the State's witness, Corey Brown, and admitted evidence of other crimes.  Finding no merit to defendant's arguments, we affirm his conviction and sentence and remand for correction of patent errors.

## PROCEDURAL HISTORY

On November 2, 2018, the Jefferson Parish District Attorney filed a bill of information charging defendant, Press Shorter, III, with the manslaughter of Brian Alexander in violation of La. R.S. 14:31.  At his arraignment, defendant entered a plea of not guilty.[1]

Various motions to suppress were filed within defendant's Omnibus Motions and Order for Pre-Trial Motions.  On October 3, 2019, the State filed a Notice of Intent to Introduce Evidence of Similar Crimes, Wrongs, Pursuant to Louisiana Code of Evidence 404(B).  On May 24, 2021, the State deleted several items from its 404(B) motion, and the trial court granted the State's 404(B) motion with the redactions.

On February 14, 2022, the matter proceeded to trial before a twelve-person jury.  During trial, on February 16, 2022, the State filed a Notice of Additional Information, a Plea Agreement with a Factual Basis, and a Motion in Limine, all regarding State's witness Corey Brown.  The trial court granted the State's Motion in Limine in open court on February 16, 2022.[2]  On that same day, the jury unanimously found defendant guilty as charged.

---

[1] On July 30, 2019, the bill of information was amended to change the date of the offense to "between September 4th and 6th."

[2] The *Nunc Pro Tunc* minute entry for February 16, 2022 does not contain the ruling for the Motion in Limine.

Thereafter, defendant filed a Motion for New Trial and a Motion for Judgment Not Withstanding the Verdict. In the Motion for New Trial, defendant reasoned a new trial was warranted because: 1) the court denied the Motion to Quash Jury Venire; 2) the court granted the State's Motion in Limine regarding the State's witness Corey Brown, limiting effective cross-examination; 3) the court denied the motion for mistrial regarding "jailhouse call #1" as other crimes evidence; and 4) the court admitted overly gruesome photos. On March 7, 2022, the trial court denied the Motion for New Trial and the Motion for Judgment Not Withstanding the Verdict. Immediately thereafter, a victim impact statement was given and defendant was sentenced to forty years imprisonment in the Department of Corrections to be served consecutive to the sentence he was serving.

On June 3, 2022, the State filed a habitual offender bill of information pursuant to La. R.S. 15:529.1, alleging defendant to be a second-felony offender. On October 11, 2022, following a hearing, the trial court adjudicated defendant a second-felony offender, vacated the original sentence, and sentenced defendant to fifty years imprisonment without the benefit of probation or suspension of sentence, to be served consecutive to case number 18-5787. On October 13, 2022, defendant filed a Motion to Reconsider Sentence, and on October 19, 2022, defendant filed a Notice of Objections to Multiple Bill of Information.

On November 14, 2022, the trial court reopened the habitual offender bill hearing due to a technical error with the clerk and court, and vacated the prior habitual offender bill adjudication and sentence. Following another hearing, the trial court adjudicated defendant a second-felony offender and sentenced defendant to fifty years imprisonment in the Department of Corrections without the benefit of probation or suspension of sentence, to "run consecutive to all other sentences which he may currently be serving." Further, on that same day, a Motion to Reconsider Sentence was filed and denied.

This appeal followed. On appeal, defendant challenges the court's restrictions regarding the cross-examination of the State's witness, Corey Brown, and the admission of evidence of other crimes.

**FACTS**

The following facts of this case arise from the homicide of inmate Brian Alexander, who died at University Medical Center ("UMC") on September 6, 2018.

On September 4, 2018, Sergeant James Glass Jr. of the Jefferson Parish Sheriff's Office Correctional Center ("JPCC") was working as the evening watch supervisor when a medical emergency call came over the radio that "a man was down" in pod 4-C. Sergeant Glass testified that Deputy Khadijah Robinson advised him that she heard a loud noise and observed inmate Brian Alexander on the ground. Sergeant Glass found inmate Alexander near cells one and two, on his back, unresponsive, not moving, and making a "snoring gurgling sound." He noticed droplets of water in the area also. When he observed inmate Alexander on the ground, he noticed other inmates were playing cards and watching TV. He did not find the other inmates' behavior typical because when there is a medical crisis or someone passes out, the inmates are "in an uproar," trying to get help or the officer's attention.[3] Sergeant Glass testified that defendant was in the shower at the time and stuck his head out from behind the curtain.

Sergeant Glass notified the medical staff at the correctional center. After they arrived, the medical staff asked Sergeant Glass to put Mr. Alexander in an upright position, and as he moved Mr. Alexander, they noticed Mr. Alexander had a knot on the back of his head. Sergeant Glass lifted Mr. Alexander into a

---

[3] During cross-examination, Sergeant Glass read from the statement he had given to Detective Kristian Fricke. In his statement, Sergeant Glass said that when he arrived on scene, the first thing on his mind was that it must have been a medical issue, so he did not pay attention to the other inmates' behaviors. Defendant did not move to introduce the statement as an exhibit into the record.

wheelchair and escorted him to the medical clinic. While in the wheelchair, Mr. Alexander was unconscious and continued to make a gurgling sound. Sergeant Glass confirmed that at no point was Mr. Alexander dropped. While in the medical unit, Mr. Alexander was assessed by the medical staff, who referred him out for additional care. EMS arrived and transported Mr. Alexander to the hospital.

Sergeant Joshua P. Blanchard with the Gretna Police Department EMS division testified that he was dispatched to the JPCC for an inmate emergency. He was advised by the staff that Mr. Alexander had fallen and hit his head. He observed Mr. Alexander to be unresponsive with "snoring respirations." Mr. Alexander's skin was pale and he had a hematoma to the back of his head. He was advised by the staff of Mr. Alexander's medical history, which included diabetes and hypertension, and that his medications were Gabapentin, insulin, and naproxen. Mr. Alexander remained unresponsive as he was taken to UMC. The UMC medical records indicate that Mr. Alexander died on September 6, 2018.

Deputy Tijuana Kelly of the JPCC's Special Investigative Unit testified that on September 4, 2018, she was notified that inmate Alexander was injured in pod 4-C.[4] She began her investigation by listening to inmate phone calls.[5] There are two inmate phones on pod 4-C, and she said inmates "like to tell people what's going on." Deputy Kelly explained that the Securus system is used by the inmates to make phone calls to civilians. The inmates insert a pin number to make phone calls, and the civilians set up an account to receive inmate phone calls. The pin

---

[4] Deputy Kelly described pod 4-C as containing thirteen cells and one shower.

[5] Deputy Kelly acknowledged that the police report indicated that Deputy Candice Emmanuel listened to the inmate calls. Deputy Emmanuel and Deputy Kelly worked in the same department and did the same investigative work.

number is also the CCN[6] number that is assigned to an inmate and placed on his armband.

While listening to the calls, Deputy Kelly heard an inmate's voice she recognized who said he "had knocked the mother f****r out." She reviewed the jail roster, which contained the cell and bunk location of inmates, and "saw somebody that [she] knew." Deputy Kelly notified her supervisor that the voice she recognized was defendant's. Deputy Kelly testified that she previously knew defendant from living in the same neighborhood, about three houses apart, from 2006 through 2018. During that time, Deputy Kelly spoke to defendant numerous times, and when defendant spoke to her, he would "stutter a little bit." She testified that the logbook indicated that defendant entered pod 4-C at 2:37 p.m., and the incident occurred at 2:45 p.m.[7]

Deputy Kelly identified a CD containing three calls, and she identified defendant's voice on all three calls. The first call was under the pin number for Valentine Martinez, who was also on pod 4-C. After she was shown a call log, she said the call under Martinez's name was made at 16:02, which is 4:02 p.m. The second call was made at 4:14 p.m. and was under the pin number for Dalonte Washington, who was also on pod 4-C.[8] The third call was under defendant's name and was made at 4:38 p.m. The second and third calls were made to phone number 3**-***-***2.[9]

---

[6] "CCN" was not defined during the trial.

[7] The logbook was generated by Deputy Robinson. The purpose of the logbook is to keep a record of everything that happens within that officer's tour of duty. The logbook indicated that a seizure or medical-related problem caused inmate Alexander to fall. The logbook also indicated that another inmate could have struck inmate Alexander, and health problems could have triggered the fall.

[8] The transcript has Mr. Washington's first name spelled as "Delante," but the call log has his first name spelled "Dalonte."

[9] Out of an abundance of caution, the phone number is redacted. *See State v. Murray*, 17-534 (La. App. 5 Cir. 3/14/18) 242 So.3d 821, 825 n.3.

The three calls were admitted into evidence and published to the jury. Deputy Kelly's testimony repeated parts of the following conversation from the second call:

Defendant: Bae, tell me why I f****d up as soon as I got in this b***h?

(In audible) [sic]

Defendant: Ya heard me?

Female: Yea, what you mean by that?

Defendant: As soon as I got in this b***h, I had knocked a N***a clean out.

Female: Really Press?

Defendant: F*****g right dawg. That N***a went, that N***a went to the hospital. F**k man. I (inaudible).

Female: For what? What they say about that?

Defendant: Nothing. I ain't get caught.

Female: Oh.

Defendant: That be my biggest fear. Every time I come to jail, I catch a f*****g charge. But I ain't doing that no more, Bae. I'm, I'm about to go back to my cell. Ya heard me? That was too close though Bae.

Female: You upstairs?

Defendant: Yea. Yep. Yep. Clean. That N***a, that N***a went to snoring Bae.

Female: For what? What he did?

Defendant: Behind that shower.

Deputy Kelly testified that on that day, there were no other inmates on the pod named "Press."

Lashannie Lard, defendant's girlfriend and mother of his child, testified that on September 4, 2018, she possessed the phone that was connected to the number 3**-***-***2, but the phone account was registered under "Belinda Lard," her mother. Defendant was the only person in JPCC who called her number. The State played the second call previously played, and Ms. Lard identified defendant

as the male voice and her voice as the one talking to defendant. When she said, "Really Press," on the call, she confirmed that she used defendant's name. When shown the call log, she identified her number as the one that was dialed on September 4, 2018 at 16:14 under Mr. Washington's name. Ms. Lard testified that she does not know Mr. Washington and never talked to Mr. Washington in jail.

Sam Williams, who at the time of trial was incarcerated at B.B. Rayburn Correctional Center,[10] testified that on September 4, 2018, he was on pod 4-C when he saw Mr. Alexander and defendant argue about the shower. He testified that he saw defendant hit Mr. Alexander in the face about three or four times. Mr. Williams was not promised anything in exchange for his testimony and stated that he was testifying at trial because it was the right thing to do. He admitted that at the time of the investigation, he did not tell the police he saw defendant hit Mr. Alexander or that there was a fight that went wrong. According to the statement he gave to the police on September 5, 2018, he said that he heard a loud noise from cell one, and when he looked, he saw Mr. Alexander lying on the floor.

Corey Brown was an inmate at JPCC at the time of trial.[11] He testified that on September 4, 2018, he was an inmate at JPCC on pod 4-C with defendant and Mr. Alexander. Mr. Brown said that Mr. Alexander had been on the pod with him for about one year. Mr. Brown testified as to the following sequence that led to Mr. Alexander being injured. Mr. Brown and Mr. Alexander were watching TV, and Mr. Alexander left to take his insulin. When Mr. Alexander returned, defendant was on the pod from intake. Defendant asked if anybody was taking a shower next, but Mr. Alexander did not hear because he had tissue in his ear. Mr.

_____

[10] Mr. Williams testified that he is serving ten years for nine counts of armed robbery and one count of simple kidnapping. He also has a prior conviction for distribution of cocaine for which he served time.

[11] Mr. Brown has felony convictions for burglary, theft, and two counts of receiving stolen things (under case number 01-2086), conspiracy to commit armed robbery (under case number 03-2811), and possession of heroin, cocaine and alprazolam, where he was charged as a third-felony offender (under case number 07-2772).

Alexander had his clothes near the shower area on top of a trash can. Mr. Brown explained, when an inmate places his clothes on top of the trash can, that lets everybody know "I'm next." When Mr. Alexander realized that defendant wanted to take a shower, Mr. Alexander went back there to let him know that he could not get in the shower. Defendant said that he had been downstairs three days and wanted to take a shower, so Mr. Alexander let him get in the shower. Mr. Alexander came back to the front by the TV, but then returned to the shower to retrieve his clothes off the trash can. When he went back, defendant had just taken his clothes off, and he hit Mr. Alexander in the face three times. Mr. Alexander did not hit defendant. After defendant hit Mr. Alexander, Mr. Brown thought that Mr. Alexander must be knocked out, because he fell on "his butt" and "then hit the floor hard." Mr. Brown said that when Mr. Alexander's head hit the floor, he heard Mr. Alexander's skull crack, and "[h]e was like breathing like a hog." After Mr. Alexander was on the ground, some inmates threw water on the floor. Mr. Brown observed the incident while he was sitting in front of the TV. Mr. Brown also saw Sergeant Glass put Mr. Alexander in a wheelchair and no one dropped him.

Mr. Brown stated that his trial testimony is the same as his statement that he gave to the police on September 11, 2018. At that time, he did not have a deal and cooperated with the police because Mr. Alexander was his friend on the pod. He testified that on September 11, 2018, he was shown a photographic line-up in which he identified defendant and wrote on the back, "He was the one who hit my friend #6." Mr. Brown was not told who to pick in the line-up and no one promised him anything.

Mr. Brown testified that he first met the assistant district attorney about a week before the trial with his lawyer present. He was then offered a fifteen-year sentence, which was the suggested sentence by the assistant district attorney. On

the morning before he testified at the instant trial, Mr. Brown accepted the State's plea deal, and he pled guilty as charged to one count of armed robbery and was sentenced to fifteen years hard labor, without a multiple bill.

On cross-examination, Mr. Brown admitted that he did not include the details regarding the wheelchair in his statement to police. He was not asked how Mr. Alexander was loaded in the wheelchair or if Mr. Alexander fell from the wheelchair, but he remembered that Mr. Alexander was not dropped in the wheelchair. After defense counsel stated Mr. Brown's prior convictions, Mr. Brown admitted that he pled guilty to the indicated charges. Mr. Brown confirmed that he provided information in September of 2018. He said he was contacted by the district attorney's office regarding his testimony for the first time about a week prior to trial. Mr. Brown also admitted that he has provided information to law enforcement before, but he could not recall how many times. He provided information to law enforcement "[b]ecause it was the right thing to do." When he provided the information to law enforcement in the past, he did not anticipate receiving "any kind of break." He also said that he did not expect leniency for his armed robbery case. Mr. Brown acknowledged he was facing ten to ninety-nine years for armed robbery. When asked, "when you end up pleading to fifteen years without a multiple bill you're doing so in part because you're expecting and received leniency and favorable consideration, correct?" Mr. Brown responded, "Yes, sir."

Sergeant Kristian Fricke, an instructor with the JPSO academy, testified that in September of 2018, he was assigned to the homicide division and was the lead investigator in Mr. Alexander's case. On September 5, 2018, Sergeant Fricke investigated the incident by meeting with Deputy Kelly, listening to three Securus recorded phone calls that were made on September 4, 2018 after the incident in question, and viewing the pod where the incident occurred. He testified that

because the inmates were released an hour and a half after the incident, the crime scene was contaminated. There were no cameras in that area. After communicating with the staff at JPCC and reviewing the 9-1-1 call, Sergeant Fricke determined that the incident occurred on September 4, 2018, at 2:50 p.m. At the time of the incident, Deputy Robinson was the only deputy on the pod, but Sergeant Fricke did not speak with Deputy Robinson.[12] Sergeant Fricke said his team members interviewed approximately seven other inmates on the pod, and about seven others refused to give any type of statement. Sergeant Fricke also said that two inmates who gave statements in 2018 were deceased at the time of trial.

Detective Anthony Buttone with the Jefferson Parish Sheriff's Office ("JPSO") homicide section testified that he assisted in the investigation of Mr. Alexander's death. Defendant was developed as a suspect and transported to his office for an interview, where he advised him of his rights. Detective Buttone also assisted with the subsequent recorded statement of defendant. After defendant gave a statement, he was placed under arrest.

During the statement, defendant said he took a shower and he lay back down. He denied having an altercation with Mr. Alexander. When shown a photograph of Mr. Alexander, defendant denied knowing him. He denied making phone calls using another person's pin number. When Detective Buttone asked defendant about prior batteries he had committed that caused both victims to suffer broken jaws, defendant denied both of them. During the statement, the detectives played the inmate call where defendant admitted he knocked somebody out, and defendant denied it was his voice and denied it was Ms. Lard's voice on the call.

---

[12] C.J. Dibble, an investigator with the Jefferson Parish District Attorney's Office, testified that about a month prior to the trial, she received a request to locate Deputy Robinson from the assistant district attorney, and she was able to locate Deputy Robinson's Atlanta, Georgia, address and phone number. Ms. Dibble tried the phone number several times, but she did not receive a response from Deputy Robinson.

Yen Van Vo, M.D., an expert in forensic pathology, testified regarding the autopsy he performed on Mr. Alexander. Dr. Vo opined that Mr. Alexander sustained multiple injuries to different portions of his head. Dr. Vo described several autopsy photos and injuries he observed during the autopsy, including a black eye on the right, a laceration or tear on the left side of the forehead, bruising in the right side of his face, hemorrhage in his scalp, blood over his brain, bleeding in the brain tissue, bruising to his brain, swelling throughout the brain, and multiple tears in the blood vessels. Dr. Vo said that the two "most important" injuries were: 1) a blow to the right side his head that caused the fracture in the skull, which caused the tearing, swelling, and bleeding on the right side of the brain; and 2) bleeding in the back of his scalp on both the left side and the right side. Dr. Vo also found bleeding in the back and front of his brain, which led him to conclude that in addition to a blow on the right side of his head, there was also a fall backwards, creating the injuries. Dr. Vo testified that the injuries are not consistent with a fall from a short height of about two feet, but they are consistent with a standing fall. Dr. Vo also examined other parts of Mr. Alexander's body and nothing else contributed to his cause of death. Dr. Vo further opined that Mr. Alexander's cause of death was from hypoxic ischemic encephalopathy due to blunt force injuries of the brain, and the manner of death was homicide.[13]

Zachary Runnels, who at the time of trial was incarcerated at B.B. Rayburn Correctional Center,[14] testified that on August 21, 2009, he was an inmate with defendant at JPCC. He went to the bathroom, and when he came back, he noticed that his bed area was flipped and some of his items were missing. He walked over to defendant and saw that defendant was coloring his inmate issued orange jumper

---

[13] Dr. Vo explained that hypoxic ischemic encephalopathy means that his brain suffered injury and was lacking in oxygen.

[14]Mr. Runnels testified that he is serving a twenty-five-year sentence for armed robbery. He has previous convictions for drugs and simple burglary.

with a marker. When Mr. Runnels asked defendant why, defendant attacked him. Mr. Runnels testified that defendant hit him in the face three or four times, causing Mr. Runnels' jaw to break in several places, which required metal plates and hinges. Mr. Runnels' injuries caused him to suffer a loss of hearing in his left ear, numbness and loss of feeling in his bottom lip, and drooling. It took him five or six years to heal. At the time of his testimony, Mr. Runnels still had problems with hearing loss and his left ear bleeding. He testified that he did not receive anything in exchange for his testimony.

Bryan Devall, who at the time of trial was incarcerated in Tensas Parish Detention Center, testified he is serving a twenty-five-year sentence for armed robbery. He testified he remembered that while he was in JPCC, somebody broke his jaw and he went unconscious. He did not recall September 23, 2013 as the date his jaw was broken, and he did not remember who broke his jaw. He denied knowing defendant, and he did not remember if he was in jail with defendant. Thereafter, the certified conviction packet of defendant, who pled guilty to second degree battery of Mr. Devall, was admitted as State's Exhibit 11. The exhibit contains a bill of information listing "Bryan Devall" as the victim and a minute entry and Waiver of Constitutional Rights Plea of Guilty form for case number 13-5113, dated January 6, 2014, stating that defendant tendered a plea of guilty to second degree battery in violation of 14:34.1.

The defense called Richard Pick, who at the time of trial was incarcerated at Caldwell Correctional Center, serving a fifteen-year sentence. He testified that he wrote a letter to the Honorable Danyelle Taylor, asking to speak to the defense attorneys in connection with the instant case. When Mr. Pick testified about the incident between defendant and Mr. Alexander, Mr. Pick estimated that he was on a pod with Mr. Alexander for six weeks. He said that he saw the staff attempt to lift Mr. Alexander into the wheelchair, but he fell and hit the ground. He further

explained, "I heard what to me was a striking of head on pavement from that fall." He described Mr. Alexander's breathing as gurgling, "like he was breathing blood." He said he saw Mr. Alexander's head "snap back" when the wheelchair was leaned back. After the incident, they were placed on lock down. Mr. Pick testified he did not see the incident and said the same when he was interviewed by a homicide detective. He said he did not mention the wheelchair incident to the homicide detective because it was the same detective that worked on his case that was still open. Mr. Pick said he was not offered anything in return for his testimony. Mr. Pick testified the State filed a writ to have him as a witness in 2021. He was later interviewed as a witness via Zoom and told the assistant district attorney the same information that he testified to during trial.

When cross-examined, Mr. Pick confirmed that he also told the assistant district attorney that he had to put his face up against the bars of his cell to see what was happening and it was "not a good view." He also confirmed that he told the detective that he was asleep in his cell when the incident occurred and had no relevant information. Mr. Pick said he knows what happened because he "remembered the sound of that body hitting," and he saw the wheelchair go out of the door. Mr. Pick did not know why Mr. Alexander was on the ground or why he could not get up.

The State called Sergeant Keyatte-Nekia Bowman on rebuttal. She was employed with the JPCC and responded to pod 4-C on September 4, 2018. When she arrived, Mr. Alexander was unconscious, lying near cells one and two, making a gurgling noise. She testified that they are not allowed to touch the inmates without medical approval, but due to Mr. Alexander's state, Sergeant Glass picked him up and put him in the wheelchair to "hurry up and get him downstairs." She was present the entire time and Sergeant Glass did not drop Mr. Alexander. She described Mr. Alexander as a "big guy" because he was above six feet.

# ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, defendant asserts that the trial court erred when it granted the State's Motion in Limine regarding Corey Brown.  He avers that the Sixth Amendment to the United States Constitution and case law afford the defendant the effective cross-examination of State witnesses and the right to present a defense.  He argues that Mr. Brown observed the incident with Mr. Alexander and illegal activities in JPCC that included sexual misconduct and drug charges which are relevant toward Mr. Brown's motivation to cooperate with the State to secure a fifteen-year sentence as a "life-eligible quadruple offender." Additionally, the defense was built around the possibility that Mr. Alexander's skull fracture was due to JPCC's negligence, which is related to the conduct Mr. Brown reported.

The Sixth Amendment to the United States Constitution guarantees the right of the accused in a criminal prosecution "to be confronted with the witnesses against him."  Additionally, the Confrontation Clause of the Louisiana Constitution directly affords the accused the right to "confront and cross-examine the witness against him."  La. Const. art. I, § 16; *State v. Casey*, 99-23 (La. 1/26/00), 775 So.2d 1022, 1030, *cert. denied*, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).  The right of confrontation does not merely allow the defendant to physically confront the witnesses against him, but secures defendant's right to cross-examine the prosecution's witnesses.  *Davis v. Alaska*, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *State v. Robinson*, 01-273 (La. 5/17/02), 817 So.2d 1131, 1135.  Cross-examination has been termed "the principal means by which believability and truthfulness of testimony are tested." *Robinson*, *supra*.  This right of confrontation is not unlimited, however, and guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent the defense

may wish. *State v. Coleman*, 13-942 (La. App. 5 Cir. 5/14/14), 142 So.3d 130, 136, *writ denied*, 14-1224 (La. 1/23/15), 159 So.3d 1056.

A witness' credibility can be attacked by extrinsic evidence to show bias, interest, or corruption. La. C.E. art. 607(D)(1). Our courts have recognized that impeaching a witness for bias or interest and exposing a witness' motivation in testifying are proper functions of cross-examination. *State v. Rankin*, 465 So.2d 679, 681 (La. 1985); *Coleman*, *supra*. A witness' hope or knowledge that he will receive leniency from the State is highly relevant to establish bias or interest, as is the possibility that the prosecution may have some leverage over a witness due to pending criminal charges or a plea agreement. *State v. Bowie*, 00-3344 (La. 4/3/02), 813 So.2d 377, 385, *cert. denied,* 537 U.S. 951, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002). Moreover, a "witness' bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct." *State v. Vale*, 95-1230, 95-577 (La. 1/26/96), 666 So.2d 1070, 1072.

The Louisiana Code of Evidence also permits a witness to be cross-examined on any matter relevant to any issue in the case, including credibility. *See* La. C.E. art. 611(B). "[G]enerally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal." La. C.E. art. 609.1(B). "Ordinarily, only the fact of a conviction, the name of the offense, the date thereof, and the sentence imposed is admissible. ..." La. C.E. art. 609.1(C).

In addition, the trial court is empowered to exercise reasonable control over the manner of interrogating witnesses and presenting evidence so as to: (1) ensure the effectiveness of the interrogation as a mode of ascertaining the truth; (2) avoid needless consumption of time; and (3) protect witnesses from harassment or undue

embarrassment. *See* La. C.E. art. 611(A). "A trial court may impose reasonable limits on defense counsel's inquiry challenging the credibility of a prosecution witness to take account of such factors as 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant.'" *State v. Hills*, 03-716 (La. App. 5 Cir. 12/9/03), 866 So.2d 278, 284, *writ denied,* 04-1322 (La. 4/22/05), 899 So.2d 569 (quoting *Robinson*, *supra*).

Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. All relevant evidence is admissible, except as otherwise provided by law, and irrelevant evidence is not admissible. La. C.E. art. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403.

The test of whether there has been a violation of a defendant's right of confrontation was discussed in *Robinson*, 817 So.2d at 1136 and reiterated in *Hills*, *supra*.

> Although the case law does not provide a consistent test for determining when a Sixth Amendment violation occurs, the Supreme Court has held that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness and thereby expose facts from which the trier of fact could appropriately draw inferences relating to the reliability of the witness. *See Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *Olden v. Kentucky*, 488 U.S. 227, 231, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988).

> (Footnote omitted.)

> A trial judge's determination regarding the relevancy, admissibility of evidence, including the scope and extent of cross-examination will not be

overturned on appeal absent a clear abuse of discretion. *Coleman*, *supra*; *State v. Sandoval*, 02-230 (La. App. 5 Cir. 2/25/03), 841 So.2d 977, 985, *writ denied*, 03-853 (La. 10/3/03), 855 So.2d 308.

In the instant case, the State's Notice of Information included the nature of the investigations for which Mr. Brown provided information, and it concluded stating, "Based on Corey Brown's above mentioned cooperation with law enforcement in unrelated matters, as well as his agreement to testify truthfully in the above captioned matter, he has received consideration from the Jefferson Parish District Attorney's Office." The State additionally filed a Motion in Limine, which sought to exclude the factual details of the information provided to law enforcement in the unrelated investigations.

The court held a hearing on the Motion in Limine during a trial recess. The State argued that the facts of the other cases in which Mr. Brown was not a defendant are irrelevant. The court stated: "You mean in other words the fact that he may have been a witness or cooperated in other investigations if he is allowed to ask for the nature of those investigations you object to[.]" Defense counsel argued that he is supposed to be effective, adhere to the Sixth Amendment, and be able to cross-examine according to the jurisprudence. The court concluded,

> [I] don't think that the nature of those investigations are germane to what we're doing here today. … [T]he fact that he may have I guess been a witness or participated in some other investigation for the purposes of showing whatever his bias might be, but what exactly he testified to and said in those other which then we would be getting into facts. … [I] agree. I don't think that's germane or relevant the fact there was an investigation about who was having sex in the jail.

Later, before he cross-examined Mr. Brown, defense counsel said, "What I'm not allowed to do is go into any of the circumstances regarding his prior cooperation with law enforcement," and the court responded, "Right."

Upon review of Mr. Brown's cross-examination and defendant's appellate brief, we find that defendant has not shown a violation of the Confrontation Clause

under the standard enumerated in *Hills*, *supra*. Defendant's brief does not provide case law to support his conclusion that defendant was deprived of the right of effective cross-examination.

The transcript reflects that defendant was allowed to engage in appropriate cross-examination that included the fact that Mr. Brown had previously provided information while he had pending charges. Defendant was allowed to cross-examine Mr. Brown regarding: 1) his previous statement to law enforcement, including the absence of details about the wheelchair; 2) when and where the plea agreement was offered; 3) the sentence arrangement for the plea agreement; 4) his prior convictions; 5) the sentence he was facing for armed robbery; 5) the fact that he had provided information to law enforcement before; 6) why he previously provided information to law enforcement; 7) his expectation of leniency or any kind of a break when he previously provided information to law enforcement; and 8) his expectation of leniency when he pled guilty to armed robbery on the morning of trial. Mr. Brown's testimony also indicates that he previously provided the information to law enforcement in the other cases and in the instant case before he met with the assistant district attorney a week before trial and received the plea-agreement offer.

Defendant was not allowed to elicit testimony regarding what Mr. Brown witnessed or said in previous investigations because the trial court found that the other investigations were not germane or relevant. As previously stated, the right of confrontation is not unlimited. The trial court may exclude testimony that it finds marginally relevant and/or irrelevant.

Upon review, we find that the events that transpired in the unrelated cases were neither relevant to, nor probative of, Mr. Brown's actions in the current case. We find that defendant was not deprived of his right to confrontation, for he was able to cross-examine Mr. Brown regarding his convictions, his statement on

September 11, 2018 regarding the instant case, details of the instant case, details of his plea agreement, and his expectation of leniency due to the information he provided in the unrelated investigations and the investigation of the instant case.

Additionally, Mr. Brown previously provided information to law enforcement as a witness while he was not under investigation or a defendant. La. C.E. art. 609.1(B) provides that witness' convictions are admissible upon the issue of his credibility, and La. C.E. art. 608(B) provides: "Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of [a] crime as provided in Articles 609 and 609.1 or as constitutionally required." What Mr. Brown witnessed or said in previous investigations in which he was not convicted could be considered particular acts and/or courses of conduct that are not admissible pursuant to La. C.E. art. 608(B).

After reviewing the record, we find that the information contained in the State's Notice of Information, as well as the details regarding the information Mr. Brown provided in prior investigations, were not relevant to the instant case. We find the trial court did not abuse its discretion in granting the State's Motion in Limine and ruling that defendant was not allowed to elicit testimony regarding what Mr. Brown witnessed or said in previous investigations. Also, we find that defendant failed to make a showing that he was prohibited from engaging in otherwise appropriate cross-examination. This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, defendant argues that the admission of the two other crimes had no probative value and were used to establish defendant as a dangerous offender. He argues that Mr. Runnel's offense occurred in 2009, approximately nine years before the alleged offense, and defendant was not

convicted of an offense against Mr. Runnels. He asserts that Mr. Devall had no recollection of his assailant or of defendant. He argues that this evidence did not prove something of independent relevance; defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident were not material facts in dispute.

The State argues that defendant committed an unprovoked fatal battery upon Mr. Alexander, and the two prior crimes also involve defendant beating other inmates and causing seriously bodily injury. The State concludes that the prior crimes were relevant to establish defendant's pattern/system and motive of assaulting other inmates in a custodial setting, and secondly, were relevant to establish his intent to assault Mr. Alexander and to rebut any implied defense that the incident with Mr. Alexander was an accident or mistake.

On October 3, 2019, the State filed a Notice of Intent to Introduce Evidence of Similar Crimes, Wrongs, Pursuant to Louisiana Code of Evidence 404(B), seeking to introduce five incidents of defendant committing batteries with punches and a closed fist inside and outside of correctional institutions, to prove intent, absence of mistake, and negate self-defense. On May 24, 2021, during the hearing on the notice of intent, the State struck several items from its 404(B) motion and sought only to introduce evidence related to defendant's arrest for second-degree battery against Mr. Runnels and defendant's conviction of second-degree battery against Mr. Devall in case number 13-5113. The State introduced the police reports from the two prior incidents and the minute entry from defendant's guilty plea regarding Mr. Devall's incident. The State argued that the two instances occurred while defendant was in JPCC, and defendant committed a battery on two inmates by striking them in the face, which was the "same thing" as in the instant case. The court granted the State's 404(B) motion, finding the two prior acts to be admissible and relevant for pattern and operation.

La. C.E. art. 404(B) provides:

Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

In order for other crimes evidence to be admitted under La. C.E. art. 404(B)(1), certain requirements must be met. *State v. Le*, 13-314 (La. App. 5 Cir. 12/12/13), 131 So.3d 306, 317, *writ denied*, 14-934 (La. 6/3/16), 192 So.3d 757. First, pursuant to *State v. Prieur*, 277 So.2d 126 (La. 1973), the State must provide written notice to the defendant of the acts it intends to prove along with the exception to the exclusionary rule upon which it relies. Additionally, the "other crimes" evidence must be admitted for other purposes, such as those listed in Article 404(B)(1), having some independent relevance, or be an element of the crime charged in order for the evidence to be admissible. *See State v. Jackson*, 625 So.2d 146, 149 (La. 1993). The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is, and has been, such evidence is not admissible to prove the accused committed the charged crime because he has committed other such crimes in the past or to show the probability he committed the crime in question because he is a man of criminal character. *State v. Lee*, 05-2098 (La. 1/16/08), 976 So.2d 109, 139, *cert. denied*, 555 U.S. 824, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008). Even when other crimes evidence is offered for a purpose allowed under La. C.E. art. 404(B)(1), the evidence must have substantial relevance independent from showing a defendant's general criminal character and thus is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. *State v. Taylor*, 16-1124 (La. 12/1/16), 217 So.3d 283, 292.

The State must prove that the defendant committed the other acts by a preponderance of the evidence. *Huddleston v. United States*, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988); *State v. Garrison*, 19-62 (La. App. 5 Cir. 4/23/20), 297 So.3d 190, 207, *writ denied*, 20-547 (La. 9/23/20), 301 So.3d 1190, *cert. denied*, -- U.S. --, 141 S.Ct. 2864, 210 L.Ed.2d 967 (2021).

Additionally, the probative value of the extraneous evidence must outweigh its prejudicial effect. *State v. Maise*, 99-734 (La. App. 5 Cir. 3/22/00), 759 So.2d 884, 894. The burden is on the defendant to show that he was prejudiced by the trial court's admission of *Prieur* evidence. *State v. Temple*, 01-655 (La. App. 5 Cir. 12/12/01), 806 So.2d 697, 709. Absent an abuse of discretion, a trial court's ruling on the admissibility of evidence pursuant to La. C.E. art 404(B)(l) will not be disturbed. *State v. Williams*, 02-645 (La. App. 5 Cir. 11/26/02), 833 So.2d 497, 507, *writ denied*, 02-3182 (La. 4/25/03), 842 So.2d 398.

In the instant case, the defense presented testimony that defendant did not hit Mr. Alexander and he fell out of the wheelchair. On appeal, defendant asserts that the prior incidents were not admissible to show motive or *modus operandi*. The State responds that defendant's prior incidents involve hitting victims while they are incarcerated together. Therefore, the prior crimes were relevant to establish defendant's pattern/system and motive of assaulting other inmates in a custodial setting.

In addition to the reasons outlined in La. C.E. art. 404(B), evidence of other crimes may be independently relevant to show *modus operandi*. Louisiana jurisprudence has long sanctioned the use of other crimes evidence to show *modus operandi*, as it bears on the question of identity, when the prior crime is so distinctively similar to the one charged, especially in terms of time, place, and manner of commission, one may reasonably infer the same person is the perpetrator in both instances. *State v. Garcia*, 09-1578 (La. 11/16/12), 108 So.3d

1, 39-40, *cert. denied*, 570 U.S. 926, 133 S.Ct. 2863, 186 L.Ed.2d 926 (2013). However, to assure that *modus operandi* or system evidence involving crimes similar to the charged offense does not become a means of introducing character and propensity evidence otherwise prohibited by La. C.E. art. 404(B), such evidence must be closely analyzed to determine whether it exhibits such peculiar modes of operation to distinguish them as the work of one person. Thus, in order to be admissible, the *modus operandi* employed by the defendant in both the charged and uncharged offenses must be so peculiarly distinctive that one must logically say they are the work of the same person. *State v. Hills*, 99-1750 (La. 5/16/00), 761 So.2d 516, 521.

In both the presently charged offense and his previous crimes, defendant punched the victims in the face, with his bare hands, while in JPCC. Defendant's punches were so powerful that they inflicted serious bodily injury on all of the victims, causing fractures to the jaw in the two prior incidents. In the instant case, Dr. Vo testified that Mr. Alexander sustained a blow to the right side his head that caused the fracture in the skull. Dr. Vo's testimony is consistent with Mr. Williams' and Mr. Brown's testimony that Mr. Alexander was punched in the face several times, rendering him unconscious, which led to Mr. Alexander falling on the shower floor.

Upon review, we find that the other crimes are relevant to illustrate defendant's pattern of behavior toward other inmates, and those incidents have many similarities to defendant's behavior with Mr. Alexander. Further, we find that the prior incidents are relevant to identity and *modus operandi*. The prior incidents show defendant's distinctive pattern of behavior. Additionally, we find that identity is at issue because the defense in the instant case is oriented around defendant's assertion that he did not commit the crime and the insinuation that Mr. Alexander's injuries occurred when Mr. Alexander allegedly fell out of a

wheelchair. We find that defendant has failed to meet his burden to show that the probative value of the evidence did not substantially outweigh its prejudicial effect.

Nevertheless, the erroneous admission of other crimes evidence is subject to a harmless error review. An error in the admission of other crimes evidence is not harmless unless a reviewing court determines that "the verdict actually rendered was surely unattributable to the error." *State v. Brown*, 18-1999 (La. 9/30/21), 330 So.3d 199, 236, *cert. denied*, -- U.S. --, 142 S.Ct. 1702, 212 L.Ed.2d 596 (2022). On defendant's inmate phone call, his voice was identified by Deputy Kelly and Ms. Lard, defendant's girlfriend. During the call, defendant admitted he "knocked out" someone because he wanted to take a shower, and the victim "went to snoring." He revealed that he sent someone to the hospital "behind that shower." Sergeant Glass saw defendant in the shower. Ms. Lard also called defendant by his first name during the call. Defendant does not identify Mr. Alexander on the call, but the details in his call to Ms. Lard reveal details that match what the witnesses said happened to Mr. Alexander in the shower. Mr. Williams and Mr. Brown testified that they saw defendant hit Mr. Alexander in the face. Dr. Vo testified that Mr. Alexander sustained multiple injuries to different portions of his head and died due to the blunt force trauma. Mr. Pick testified that he saw the staff attempt to lift the victim into the wheelchair, but the victim fell and hit the ground. However, Sergeant Glass and Sergeant Bowman testified that the victim did not fall out of the wheelchair nor was he dropped.

Accordingly, we find that the trial court did not abuse its discretion in finding the other crimes evidence admissible. Additionally, we find that the guilty verdict actually rendered was surely unattributable to the evidence of the other crimes. Based on the foregoing, we find that this assignment of error is without merit.

# ERRORS PATENT REVIEW

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920, *State v. Oliveaux*, 312 So.2d 337 (La. 1975), and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990).

On November 14, 2022, the court sentenced defendant to fifty years in the Department of Corrections without the benefit of probation or suspension of sentence, to "run consecutive to all other sentences which he may currently be serving." The minute entry states, "The Court ordered that the above sentence is to run consecutively with any and all other sentences Defendant may be currently serving." However, the Louisiana Uniform Sentencing Commitment Order ("UCO") states the sentence is consecutive to "any and all other sentences Defendant may be currently serving **Jefferson, 24th JDC.**" (Emphasis added.) We find that the addition of "Jefferson, 24th JDC" on the UCO is not consistent with the transcript and remand the matter to correct the UCO to reflect the consecutive sentence consistent with the transcript.

Additionally, the UCO contains a column that states, "Amount of time to be served without benefit, if applicable (8)." The column is void of the amount of time to be served without benefit. Although under *State v. Williams*, 00-1725 (La. 11/28/01), 800 So.2d 790, 799 and La. R.S. 15:301.1(A), the "without benefits" provision is self-activating, we remand this matter to the trial court to correct the UCO to reflect the restriction of benefits. *State v. Jaufre*, 14-259 (La. App. 5 Cir. 10/29/14), 164 So.3d 888, 890. We further direct the Clerk of Court for the 24th Judicial District Court to transmit the original of the corrected UCO to the institution to which defendant has been sentenced and to the Department of Corrections' legal department.

## DECREE

For the foregoing reasons, defendant's conviction and sentence are affirmed. The matter is remanded to the trial court with instructions to correct the UCO as set forth above.

**AFFIRMED; REMANDED FOR CORRECTION OF THE UNIFORM COMMITMENT ORDER**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **NOVEMBER 29, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

*Curtis B. Pursell*

**CURTIS B. PURSELL**
CLERK OF COURT

## 23-KA-128

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE DANYELLE M. TAYLOR (DISTRICT JUDGE)
DARREN A. ALLEMAND (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          HOLLI A. HERRLE-CASTILLO
JUSTIN C. HARRELL (APPELLANT)                                               (APPELLANT)

### MAILED
TUCKER H. WIMBERLY (APPELLEE)          HONORABLE PAUL D. CONNICK, JR.
ATTORNEY AT LAW                        (APPELLEE)
3421 NORTH CAUSEWAY BOULEVARD          DISTRICT ATTORNEY
SUITE 408                              JOAN BENGE (APPELLEE)
METAIRIE, LA 70002                     ASSISTANT DISTRICT ATTORNEY
                                       TWENTY-FOURTH JUDICIAL DISTRICT
                                       200 DERBIGNY STREET
                                       GRETNA, LA 70053